66 A.3d 157

RONALD C. REESE, PLAINTIFF–RESPONDENT/CROSS–APPEL-
LANT, v. REBECCA WEIS, F/K/A REBECCA REESE, DE-
FENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 11, 2012—Decided May 7, 2013.

556

Before Judges LIHOTZ, OSTRER and KENNEDY.

*Gary Newman* argued the cause for appellant/cross-respondent (*Newman, McDonough, Schofel & Giger, P.C.*, attorneys; *Mr. Newman* and *Alison M. Schmieder*, on the briefs).

*Bonnie C. Frost* argued the cause for respondent/cross-appellant (*Einhorn, Harris, Ascher, Barbarito & Frost, P.C.*, attorneys; *Ms. Frost*, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

At issue in this matter is whether defendant received a substantial economic benefit as a result of her cohabitation, such that alimony should be terminated. We conclude the inquiry regarding whether an economic benefit arises in the context of cohabitation must consider not only the actual financial assistance resulting from the new relationship, but also should weigh other enhancements to the dependent spouse's standard of living that directly

result from cohabitation. We also find a trial judge may properly evaluate the duration of the new relationship and assess its similarities to the fidelity associated with marriage when determining whether to modify or terminate alimony.

In this matter, following a post-judgment evidentiary hearing, the trial judge determined defendant's open, ten-year cohabitation afforded her a significant economic benefit such that alimony was no longer warranted. Defendant Rebecca Weis appeals from the Family Part order terminating the obligation of her former spouse, plaintiff Ronald C. Reese, to pay alimony. On appeal, defendant challenges as erroneous the court's factual findings and legal conclusions.

Subsequent motions filed by the parties sought to fix the effective date of the order terminating alimony. The judge rejected plaintiff's position seeking to use the date he filed his original motion, and defendant's position suggesting alimony should terminate on the date the order was entered. After considering the interests involved, the judge concluded the appropriate effective date of the order was coincident with the emancipation of the parties' oldest child. Plaintiff cross-appeals from that order.

We have considered the parties' arguments advanced on appeal and on cross-appeal in light of the record and applicable law. Except for a technical correction in the order fixing an effective date, we affirm.

## I.

The parties' July 17, 1996 judgment of divorce (JOD) ended their thirteen-year marriage. Among its provisions, the JOD required plaintiff to pay defendant permanent alimony of $100,000 per year. This sum, combined with other provisions for support of the parties' three children, resulted in plaintiff paying defendant $237,872 per year.

Defendant began cohabitating with William Stein when they jointly purchased a home in Port Washington, New York, on

October 13, 1998. Defendant explained: "I was responsible for my life and my children's lives[;] he was responsible for his life and his children's lives.... It was just not a marriage we were entering into." Defendant and the parties' three children, along with Stein and his two children, moved into the Port Washington home.

Plaintiff remarried in 1997. He and his wife have two children and reside in New Jersey and Florida.

On August 12, 2008, plaintiff filed a motion to terminate his obligation to pay alimony, citing defendant's cohabitation with Stein. Defendant never hid her cohabitation with Stein. She explained the two intended to remain in a long-term, exclusive, intimate, romantic relationship.[1] The trial evidence focused on the financial arrangements between defendant and Stein from 2006 to 2008. Defendant and Stein testified; defendant offered expert testimony from Steven Reiss, an accountant; and plaintiff presented expert testimony from Thomas J. Hoberman, CPA. The following facts are taken from the trial record.

When defendant and Stein purchased their home, they agreed to divide acquisition and renovation costs based on the size of their respective families. Accordingly, defendant paid four-sevenths of the home's $567,500 purchase price and the $400,000 renovation costs, while Stein paid three-sevenths of these expenses.[2] At the time of trial, the house, encumbered by two mortgages totaling $650,000, was expected to be listed for sale for $1.9 million. Insisting she was paying her way, defendant nonetheless acknowledged she would not have been able to live in the type of home she

---

[1] The record includes a prior motion specifically addressing cohabitation. In 2000, the parties agreed defendant's cohabitation triggered a condition in the JOD, terminating plaintiff's obligation to maintain life insurance to secure his alimony payment. The parties entered a consent order eliminating the life insurance obligation.

[2] Defendant explained once the renovations were completed, the parties refinanced the mortgage, increasing the debt from $450,000 to $650,000. Defendant received four-sevenths, or $114,285, of withdrawn equity.

and Stein purchased had it not been for Stein's initial and on-going contribution.

Defendant and Stein maintained separate telephone listings, individual savings and checking accounts, and personal credit cards. Further, they socialized and vacationed together and separately, and felt no formal obligation to the other's family. However, the record includes evidence showing defendant and Stein conducted themselves as a family unit. On cross-examination, defendant agreed Stein participated in family religious events, the children addressed Stein's parents as "Grandma" and "Grandpa[,]" and the families celebrated an occasional holiday together. Also, the parties' children shared bedrooms and were said to refer to each other as step-siblings.

Additionally, defendant and Stein owned a joint checking account and were signatories on joint Visa and American Express accounts, utilized to satisfy "joint" household expenses. The children had permission to use these credit cards. Defendant asserted "we wanted to try as best we could to keep our finances separate and the best way to keep our finances separate w[as] to have a joint account."

Defendant explained she deposited her receipts from alimony, child support, gifts, investment income, and any earnings, into her individual savings account. Each month she withdrew $8166 from her personal funds, which she deposited into the joint checking account. Stein matched the amount from his personal funds and deposited it into the joint checking account. The money in the joint checking account was used to pay the mortgage, real estate taxes, repairs, maintenance, utilities, landscaping, furniture, food, clothing, pharmacy, dry cleaning, gifts, housekeeper, dog care, summer camp, and other "everyday" expenses for all five children.

Defendant clarified that her individual credit cards were used to pay personal expenses for herself and the children, and she paid these bills solely from her personal checking account. The monthly Visa balances were paid from the joint checking account funds; however, Stein personally paid the joint American Express bill

along with the bill from charges made to his individual American Express account.

Defendant and Stein conceded their financial arrangement was not based on the actual responsibility for an expense. No reconciliation was ever made to discern whether personal expenses were excluded from those satisfied with joint funds, or to assure each party paid his or her share of joint expenses. For example, defendant alone made cash withdrawals from the joint checking account using an ATM card and would sometimes "reimburse" the joint account if she felt she had incurred a personal, rather than joint, expense. If Stein perceived the joint American Express charges were high, he decided to withhold his monthly deposit to the joint account.

Defendant admitted "[i]t's difficult to keep the exact individual payments separate." Since she wrote almost all the checks drawn on the joint checking account, she decided whether to allocate bills as personal or joint. She explained "[t]here [wa]s no specific science" for reimbursements, nor a clear demarcation between their joint and personal expenses. She did not keep a ledger or actually review the expenditures with Stein, but assured she "just knows" that she used only her share of the joint account funds for her children, as she "followed [her] intent" and did "what was right in [her] mind and ... heart" because she "trusted [her] instincts."

Elaborating on their financial relationship, defendant noted Stein personally paid for "luxuries, vacations, trips, [and] gifts" for her and the children, but not her expenses. She described elaborate vacations the combined family enjoyed, including a sail cruise to the Bahamas (2002); a week in the Galapagos Islands, Ecuador (2004); a $120,000 safari vacation in Africa (2006); a yachting trip to Cape Cod and Nantucket, Massachusetts (2007); a ten-day trip to Sedona, the Grand Canyon, Las Vegas, and Malibu (2007); excursions to Disney World; a villa at Half Moon Bay, Jamaica; and several ski trips each year to Vail, Colorado, Smuggler's Notch or Okemo Mountain, Vermont. At times, the parties'

children were permitted to invite friends to accompany them on a vacation, for which Stein paid all costs. Stein also paid the costs incurred when he and defendant spent weekends in Washington, D.C., Beverly Hills, and New York City; attended the U.S. Open; and traveled to Greece, Anguilla, and Italy. Stein took defendant's two older children to California because the oldest child was interested in attending graduate school at the University of Southern California, and the three attended the Rose Bowl. Further, Stein had access to, and defendant and her children used, his family's private jet and his ski boat.

Stein also exclusively paid certain everyday expenses. He had acquired and paid all costs associated with a Jeep and Range Rover, primarily driven by the children; satisfied the lease on defendant's Mercedes CLK, and, when that vehicle was sold, paid for her Mini Cooper. Further, he satisfied all car insurance, repairs, and maintenance bills for all of the household's vehicles. His family's business extended full health insurance coverage to defendant, and he regularly gave her gifts of shoes, tennis lessons, handbags, and jewelry.

Defendant asserted Stein's generous provision of luxury expenses and gifts ceased in 2008, when he suffered financial reversals caused by the economic downturn in the real estate market. Stein and his family lost more than $11 million between bad investments in Madoff Securities and an uncompleted real estate development project known as "Oliver House." Additionally, Stein sold or listed for sale his luxury automobiles in favor of more practical cars, the family "rarely" ate out, conserved utilities, trimmed entertainment and vacation costs, and eliminated expenses for the housekeeper and someone to clean-up after the dog.

During her testimony defendant discussed her case information statements (CIS) filed during the post-judgment litigation. Generally, she disclaimed knowledge of individual expense items included in her monthly budget of $17,935, stating she did not review the underlying documents, but merely signed the CIS as prepared and presented to her by her accountant, Reiss. On

cross-examination, defendant sought to correct certain CIS entries, asserting Reiss got them wrong; however, she was not certain of the actual correct amounts.

To prepare his report, representing a three-year income and expense statement, Reiss met with defendant and Stein, reviewed her checking account statements and cancelled checks from 2006 to 2008, considered defendant's individual credit card statements from 2006 to 2008, the joint checking account, and the expenses paid individually by Stein. Reiss initially calculated the total annual expenses in a category, which he then divided between defendant and Stein to determine their respective obligations. Next, the mortgage, real estate taxes, and improvements were allocated four-sevenths to defendant and three-sevenths to Stein, while other expense items were split equally, such as alcohol, food, magazines, pet expenses, and items associated with operating the residence. Items like vacations sometimes were allocated solely to defendant and other times partially to each party. Reiss computed the average of defendant's annual expenditures totaled $306,624, and noted, when the total expenses exceeded her income receipts, she used savings to satisfy the shortfall.

Reiss computed defendant's share of the annual shelter expenses as $74,855, and conceded she would not be able to afford to live in the residence if not for Stein's contribution. Also, but for the luxury vacations, Reiss concluded Stein was not contributing to defendant's support.

On cross-examination, the accuracy of Reiss's report was explored. He acknowledged he had captured defendant's spending and sources of funding, not her needs. Reviewing his report, Reiss stated, over a three-year period, defendant paid $152,000 more than Stein into the joint account, and over that same period Stein individually paid $175,679 that defendant had charged to the American Express account and $118,000 of expenses Stein personally charged, but which Reiss determined were joint expenses. When these sums are added to the $224,000 Stein also transferred into the joint account, Reiss concluded Stein had paid $146,000

more toward the joint expenses than defendant over the three-year period.

Reiss admitted certain anomalies were present in his report. For example, first, he included health insurance among defendant's necessary expenses, but did not add the funding source of this item when reporting defendant's resources. Second, he had excluded the insurance and payments for defendant's and the children's cars, along with gifts such as defendant's tennis lessons, when totaling defendant's available income receipts. Third, Reiss acknowledged he had not reviewed Stein's checking account or considered what he might have paid from that account on behalf of defendant. Fourth, some of Stein's individual expenses, such as costs associated with his boat, were split, artificially increasing defendant's annual needs. And fifth, payments totaling $14,225 were catalogued as Stein's personal expenses; however, the check recipient was actually defendant.

Plaintiff's case included the expert testimony of Hoberman. He generally reviewed the same information Reiss did. However, his focus was not only the actual expenses paid, but who was funding those expenses. From this perspective, Hoberman concluded defendant benefited from cohabiting with Stein, and insisted her lifestyle was enhanced by Stein's contribution of luxuries, which afforded defendant an additional economic benefit.

Based on the joint checking account system, which defendant controlled, Hoberman found she did not exclusively pay her and her children's personal expenses, which he averaged as $142,000 per year. He calculated Stein contributed 56.5% of the total joint expenses, excluding vacations, automobile costs (e.g., fuel, loan payments, and insurance), homeowner's insurance, and restaurants, while defendant paid only 43.5%. At the same time, Hoberman computed defendant and her children consumed 57% of these items, while Stein and his children consumed only 43%. Using these figures, Hoberman concluded the benefit to defendant resulting from Stein's excess contribution equaled $49,337 per year.

Hoberman also considered that Stein's children lived in the home only half of the time, making their consumption the equivalent of one full-time child. Using this assumption, he concluded Stein's family actually constituted only one-third of the household members, thus increasing defendant's economic benefit from Stein's excess contribution to $84,786.

Additionally, Hoberman considered Stein's average annual payment over the three-year period attributed to vacations ($42,879), car purchases/leases ($21,000), car and homeowner's insurance ($4500), and health insurance ($8,996). If these items were added to Stein's excess contributions, and three-sevenths were allocated to Stein, defendant's net benefit increased to at least $65,783 per year. Alternatively, if Stein's expenses amounted to one-third, the benefit to defendant rose to $113,048.

Next, Hoberman applied defendant's tax bracket, opining her total pre-tax annual benefit, that is, the sum necessary to net the payments from Stein and satisfy hypothetical income taxes as if Stein's payments were earned income, was at least $105,899. He stated this amount could possibly be as much as $141,000, if Stein's share of the expenses was assumed to be only one-third not three-sevenths.

Finally, Hoberman analyzed account statements from Stein's employer, Omnibus, a partnership owned by Stein's mother and his father's former business partner, to challenge Stein's assertion he left Omnibus in December 2008, because the business was devastated by Madoff sham investments. Hoberman found Stein's claim was belied by $6 million increase in Omnibus' income from 2008 to 2009.

On cross-examination defendant undermined Hoberman's opinion by showing he had artificially increased the total "household expenses" by including costs associated with Stein's boat, Aston Martin, and the extravagant vacations, which undisputedly were Stein's individual obligations. Hoberman justified his allocation, asserting Reiss had classified some boat expenses as "joint household expenses" and defendant benefited from the enhancements in

lifestyle individually paid by Stein. Therefore, he reasoned they should be included as a benefit to defendant.

In the written, twenty-two page opinion, the trial judge considered and rejected defendant's legal argument suggesting plaintiff waived the right to terminate alimony because he delayed filing his application despite knowing for ten years that she was cohabiting. She found defendant and Stein's finances were "intertwined," and defendant failed to show her expenses were separate from and satisfied by her separate income receipts.[3] Based on these findings, the trial judge granted plaintiff's application to terminate alimony and denied the parties' respective requests seeking payment of attorney's fees and costs. A June 6, 2011 order memorialized the court's determinations.

Subsequent motions were filed and considered by the trial judge. On September 27, 2011, she entered a supplemental order rejecting defendant's request for reconsideration. In expanding the basis for terminating alimony rather than reducing it, the judge stated:

> The cohabitant relationship between Rebecca Weis and Billy Stein has continued five years longer than the marriage of Rebecca Weis to Dr. Reese. Plaintiff and [d]efense experts each agree Ms. Weis does receive an economic benefit based on her cohabitation with Billy Stein. For this [c]ourt, to have found that a reduction and not a termination of alimony should be considered, the [c]ourt would have to determine that there is still a need for spousal support for [d]efendant to maintain a lifestyle that is reasonably comparable to the lifestyle that Ms. Weis enjoyed when she was married to Dr. Reese....
>
> ....
>
> There is no compelling argument that spousal support should be continued. [Defendant] does not demonstrate a continued financial need to maintain a lifestyle commensurate with the lifestyle that she shared with the plaintiff because she has sufficient assets, available income and the financial support of her long[-]term partner[,] Mr. Stein. This court finds that economic benefit [i]n[ ]uring to Ms. Weis[ ] is sufficiently material to justify relief.

---

[3] In addition to support paid by plaintiff, the judge found defendant had annual receipts of $22,000 from her job as a teacher; annual gifts from her parents, including $50,000 in 2007; $36,000 in pre-tax gifts from family members; and unearned income of approximately $14,000 per year.

In response to plaintiff's motion to fix the effective date of the order, the judge declined to use the motion filing date, instead using November 13, 2009, the emancipation date of the oldest child. The judge determined the use of the motion filing date would be too prejudicial to defendant because she had agreed to pay 20% of the children's college costs with the understanding she would be receiving alimony. These cross-appeals ensued.

## II.

### A.

The scope of our review of a trial court's findings of fact is limited. *Cesare v. Cesare,* 154 *N.J.* 394, 411, 713 *A.*2d 390 (1998). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." *Id.* at 411–12, 713 *A.*2d 390 (citation omitted). We accord particular deference to the judge's factfinding because of "the family courts' special jurisdiction and expertise in family matters[.]" *Id.* at 413, 713 *A.*2d 390. *See also Crespo v. Crespo,* 395 *N.J.Super.* 190, 193–94, 928 *A.*2d 833 (App.Div.2007). Reversal is warranted only when a mistake must have been made because the trial court's factual findings are " 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]' " *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (quoting *Fagliarone v. Twp. of N. Bergen,* 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div), *certif. denied,* 40 *N.J.* 221, 191 *A.*2d 61 (1963)).

In our review, we are obliged to accord deference to the trial judge's credibility determinations. *Cesare, supra,* 154 *N.J.* at 412, 713 *A.*2d 390. Such deference is appropriate because the trial judge has "a feel of the case" and is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand[.]" *N.J. Div. of Youth & Family Servs. v. E.P.,* 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (internal quotation marks and

citation omitted). "When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." *N.J. Div. of Youth & Family Servs. v. F.M.*, 375 *N.J.Super.* 235, 259, 867 *A.*2d 499 (App.Div. 2005) (citing *In re Guardianship of D.M.H.*, 161 *N.J.* 365, 382, 736 *A.*2d 1261 (1999)). Consequently, when a reviewing court concludes there is satisfactory evidentiary support for the trial court's findings, " 'its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal.' " *Beck v. Beck*, 86 *N.J.* 480, 496, 432 *A.*2d 63 (1981) (quoting *State v. Johnson*, 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)).

When "the focus of the dispute is ... alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." *N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007) (internal quotation marks and citations omitted). Deference is appropriately accorded to factfinding; however, the trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). Our review of a trial court's legal conclusions is always de novo. *Dep't of Envtl. Prot. v. Kafil*, 395 *N.J.Super.* 597, 601, 930 *A.*2d 457 (App.Div.2007).

### B.

Here, defendant readily admits she and Stein have cohabited since 1998. Although the trial court was not required to find, and we need not review this fact, we believe the legal underpinnings necessary to establish cohabitation inform our review of the related question before us of whether an economic benefit derived from the relationship warrants the reduction or termination of alimony. We start by restating why alimony is awarded.

Alimony is a claim arising upon divorce, which is rooted in the prior interdependence occurring during the parties' marital relationship. "[A]limony is neither a punishment for the payor nor a reward for the payee." *Mani v. Mani*, 183 *N.J.* 70, 80, 869 *A.*2d 904 (2005) (citations omitted).

In *Mani, supra,* the Court traced the history of alimony, concluding today's awards reflect the "economic right ... aris[ing from] the marital relationship[,]" 183 *N.J.* at 78–80, 869 *A.*2d 904, designed to give a financially dependent spouse " 'a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage,' " *id.* at 80, 869 *A.*2d 904 (quoting *Stiffler v. Stiffler,* 304 *N.J.Super.* 96, 99, 698 *A.*2d 549 (Ch.Div.1997)). *See also Crews v. Crews,* 164 *N.J.* 11, 24, 751 *A.*2d 524 (2000) (holding the goal of an alimony award is to allow the dependent spouse the ability to continue the standard of living established during the marriage (citation omitted)).

It has long been held that alimony is awarded because of an "actual economic dependency" and not because of one's status as a spouse. *Lepis v. Lepis,* 83 *N.J.* 139, 155, 416 *A.*2d 45 (1980). The Legislature delineated considerations to be weighed when reviewing a claim for alimony. *See N.J.S.A.* 2A:34–23 (detailing a non-exclusive list of factors considered when determining whether to award alimony). Consequently, the statutory factors emphasize facts reflecting need and the ability to pay. Resolving whether a dependent spouse can continue to provide for his or her support at "[t]he standard of living established in the marriage[,]" *N.J.S.A.* 2A:34–23b(4), requires a trial court to assess the current financial earnings and assets of each party, and consider each person's future ability to earn and contribute to his or her support.

An award of alimony remains subject to review and, if warranted, modification, when either party experiences a substantial change in financial circumstances. *Lepis, supra,* 83 *N.J.* at 146, 416 *A.*2d 45 (citation omitted). *See also N.J.S.A.* 2A:34–23 (stat-

ing alimony orders "may be revised and altered by the court from time to time as circumstances may require").

 The cohabitation of a dependent spouse constitutes an event of changed circumstances, which requires further review of the economic consequences of the new relationship and its impact on the previously imposed support obligation. *Gayet v. Gayet,* 92 *N.J.* 149, 155, 456 *A.*2d 102 (1983); *Lepis, supra,* 83 *N.J.* at 151, 416 *A.*2d 45 (citation omitted). *See also Boardman v. Boardman,* 314 *N.J.Super.* 340, 347, 714 *A.*2d 981 (App.Div.1998) (explaining "cohabitation constitute[s] changed circumstances ... justifying discovery and a hearing").

 Cohabitation involves an "intimate[,]" "close and enduring" relationship, requiring "more than a common residence" or mere sexual liaison. *Konzelman v. Konzelman,* 158 *N.J.* 185, 202, 729 *A.*2d 7 (1999). Cohabitation involves conduct whereby "the couple has undertaken duties and privileges that are commonly associated with marriage." *Ibid.* In addition to long-term intimate or romantic involvement, indicia of cohabitation may "include, but are not limited to, living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle." *Ibid.* The couple's relationship "bears the generic character of a family unit as a relatively permanent household[,]" *Gayet, supra,* 92 *N.J.* at 155, 456 *A.*2d 102 (internal quotation marks and citation omitted), is "serious and lasting[,]" and reflects the "stability, permanency and mutual interdependence" of a single household, *Konzelman, supra,* 158 *N.J.* at 202–03, 729 *A.*2d 7.

 In *Ozolins v. Ozolins,* 308 *N.J.Super.* 243, 248, 705 *A.*2d 1230 (App.Div.1998), we held "a showing of cohabitation creates a rebuttal presumption of changed circumstances shifting the burden to the dependent spouse to show that there is no actual economic benefit to the spouse or the cohabitant." *See also Conlon v. Conlon,* 335 *N.J.Super.* 638, 650, 763 *A.*2d 339 (Ch.Div. 2000) (holding the dependent spouse has the burden of proof "to

address the economic consequence of the [new] relationship in order for the [c]ourt to make an appropriate assessment regarding a modification or termination of alimony"). Consequently, when faced with the circumstance of cohabitation of a dependent spouse, the court must focus on the economic relationship of the cohabitants to discern whether one cohabitant "subsidizes the other[.]" *Boardman, supra,* 314 *N.J.Super.* at 347, 714 *A.*2d 981 (internal quotation marks and citations omitted).

Modification of alimony is warranted when either the cohabitant contributes to the dependent spouse's support or lives with the dependent spouse without contributing. *Garlinger v. Garlinger,* 137 *N.J.Super.* 56, 64, 347 *A.*2d 799 (App.Div.1975). When a dependent spouse economically benefits from cohabitation, his or her support payments may be reduced or terminated. *Gayet, supra,* 92 *N.J.* at 155, 456 *A.*2d 102. *See also Melletz v. Melletz,* 271 *N.J.Super.* 359, 363, 638 *A.*2d 898 (App.Div.) (stating "the test for determining whether cohabitation by the dependent spouse should reduce an alimony award has always been based on a theory of economic contribution"), *certif. denied,* 137 *N.J.* 307, 645 *A.*2d 136 (1994). "The extent of actual economic dependency, not one's conduct as a cohabitant, must determine the duration of support as well as its amount." *Gayet, supra,* 92 *N.J.* at 154, 456 *A.*2d 102.

In order to rebut the presumption that the living arrangement is tantamount to marriage and has reduced or ended the need for alimony, a dependent spouse must prove he or she remains dependent on the former spouse's support. *Id.* at 154–55, 456 *A.*2d 102.

## C.

Each motion to modify an alimony obligation "rests upon its own particular footing and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters." *Donnelly v.*

*Donnelly*, 405 *N.J.Super.* 117, 127, 963 *A.*2d 855 (App.Div.2009) (internal quotation marks and citations omitted). Our review of a trial judge's exercise of discretion is limited.

> "[J]udicial discretion" is the option which a judge may exercise between the doing and the not doing of a thing which cannot be demanded as an absolute legal right, guided by the spirit, principles and analogies of the law, and founded upon the reason and conscience of the judge, to a just result in the light of the particular circumstances of the case.
>
> [*Smith v. Smith*, 17 *N.J.Super.* 128, 132, 85 *A.*2d 523 (App.Div.1951) (citations omitted), *certif. denied*, 9 *N.J.* 178, 87 *A.*2d 387 (1952).]

We will not second-guess a trial judge's sound exercise of discretion because we recognize "[j]udicial discretion connotes conscientious judgment, not arbitrary action; it takes into account the law and the particular circumstances of the case before the court." *Higgins v. Polk*, 14 *N.J.* 490, 493, 103 *A.*2d 1 (1954) (citation omitted). However, "judicial discretion is not unguided or uncontrolled." *Cosme v. Borough of E. Newark Twp. Comm.*, 304 *N.J.Super.* 191, 202, 698 *A.*2d 1287 (App.Div.1997), *certif. denied*, 156 *N.J.* 381, 718 *A.*2d 1210 (1998). Nor is it "the personal predilection of the particular judge." *Clark v. Clark*, 429 *N.J.Super.* 61, 72, 57 *A.*3d 1 (App.Div.2012) (internal quotation marks and citation omitted). Accordingly, our review of the trial judge's discretionary termination of alimony is limited to whether the court made findings inconsistent with the evidence or unsupported by the record, or erred as a matter of law. *Gordon v. Rozenwald*, 380 *N.J.Super.* 55, 76, 880 *A.*2d 1157 (App.Div.2005) (citing *Tash v. Tash*, 353 *N.J.Super.* 94, 99, 801 *A.*2d 436 (App.Div.2002); *Rolnick v. Rolnick*, 262 *N.J.Super.* 343, 359–60, 621 *A.*2d 37 (App.Div. 1993)).

### III.

The Supreme Court has described what constitutes cohabitation. *See Konzelman, supra*, 158 *N.J.* at 202, 729 *A.*2d 7; *Gayet, supra*, 92 *N.J.* at 155, 456 *A.*2d 102. This court has explained the respective burdens of the parties when claimed cohabitation serves as a basis to modify an alimony obligation. *Ozolins, supra*, 308 *N.J.Super.* at 248, 705 *A.*2d 1230. These cases hold a supporting

spouse's obligation may be modified or terminated when a dependent spouse economically benefits from cohabiting. *Gayet, supra,* 92 *N.J.* at 155, 456 *A.*2d 102. However, the courts have not had occasion to develop standards defining what constitutes an economic benefit or when such a benefit warrants termination rather than modification of alimony. This case raises legal and factual questions confronting each of these issues. We turn to defendant's arguments on appeal.

Initially defendant argues, "as a matter of law," alimony may only be terminated upon remarriage, not as a result of cohabitation. She contends "[t]he mere existence of an economic benefit to the supported spouse by way of cohabitation clearly does not compel termination of alimony."

Next, she attacks the sufficiency of the evidence supporting the trial judge's conclusions, contending application of the economic means test articulated by the New Jersey Supreme Court in *Konzelman* would only mandate a reduction in alimony commensurate with the actual economic benefit received, not complete elimination of support. *Supra,* 158 *N.J.* at 196, 729 *A.*2d 7 (stating, upon proof of an economic benefit resulting from cohabitation, "the reduction in alimony is granted in proportion to the contribution of the cohabiter to the dependent spouse's needs"). Defendant acknowledges she was "the beneficiary of certain gifts," but insists Stein's generosity did not equate to support, which requires payment of basic needs for food and shelter, items she alleges she alone satisfied. Moreover, defendant maintains the trial judge failed to quantify Stein's contribution to defendant's needs, making "the summary termination of alimony ... plain error." An alternative argument suggests the alimony award may be reduced or suspended, subject to a future right to request its reinstatement once economic circumstances change.

Further, defendant maintains error resulted from the judge's legal conclusion neither laches nor equitable estoppel barred plaintiff's motion. Maintaining she suffered prejudice from plaintiff's belated enforcement efforts, defendant avers plaintiff's forbear-

ance, despite knowledge of her cohabitation with Stein, "induced" her "to absent herself from a career path for many years."

Defendant also challenges, as does plaintiff in his cross-appeal, the effective date of the order, asserting retroactive termination was error. On the other hand, plaintiff argues for an earlier date, specifically the date he filed his motion.

Finally, defendant seeks reversal of the order's provision denying her counsel fees.

### A.

Relying on *N.J.S.A.* 2A:34-25, defendant argues the Legislature's statutory directive provided for termination of an alimony award only upon the death of the payor spouse and "as of the date of remarriage" of a former spouse. She suggests termination of a "permanent alimony" award is restricted to these discrete events. We conclude this argument is meritless.

In addition to the events defined in *N.J.S.A.* 2A:34-25, the Family Part's jurisdiction to modify permanent alimony awards "as circumstances may require" is clearly defined in *N.J.S.A.* 2A:34-23. Moreover, alimony orders must be rendered that "the circumstances of the parties and the nature of the case ... render fit, reasonable and just[.]" *Ibid.* The statute has been construed to allow court-ordered termination of alimony when the underpinnings supporting the initial award have significantly changed. *Crews, supra,* 164 *N.J.* at 24, 751 *A.*2d 524 (citing *Lepis, supra,* 83 *N.J.* at 145, 416 *A.*2d 45). For example, an increase in a dependent spouse's income or a decrease in a supporting spouse's income may be so dramatic as to warrant modification or elimination of an alimony obligation. *Innes v. Innes,* 117 *N.J.* 496, 504, 569 *A.*2d 770 (1990) (citations omitted). Similarly, illness, disability, or infirmity arising after the original judgment may serve as the basis to end an alimony award. *Lepis, supra,* 83 *N.J.* at 151, 416 *A.*2d 45 (citations omitted). And, as we have noted earlier, equity and fairness demand that when a dependent spouse receives outside support from one with whom he or she cohabits,

this change must also be treated in the same manner as any other change in the circumstances. Consequently, when the contribution is significant, the need for alimony may end.

Decades ago, this court explained:

> We have no doubt, however, that where a former wife chooses to cohabit with a paramour, whether in her abode or his ... the issue may well raise whether ... she has further need for the alimony. If it is shown that the wife is being supported in whole or in part by a paramour, the former husband may come into court for a determination of whether the alimony should be *terminated or reduced.* ... In short, the inquiry is whether the former wife's ... relationship with another man ... has produced a change of circumstances sufficient to entitle the former husband to relief.
>
> [*Garlinger, supra,* 137 *N.J.Super.* at 64, 347 *A.2d* 799 (emphasis added).]

*See also Wertlake v. Wertlake,* 137 *N.J.Super.* 476, 487, 349 *A.2d* 552 (App.Div.1975) (same).

We reject the notion that permanent alimony yields only to the death of the supporting spouse or remarriage of the dependent spouse. The Legislature's use of the term permanent alimony is a misnomer in the sense that the award is not everlasting. That changed circumstances dictate modification is well-established, as is the possibility that modification may include termination. *Lepis, supra,* 83 *N.J.* at 151, 416 *A.2d* 45. Consequently, the recognized change of circumstances resulting from a dependent spouse's receipt of a significant economic benefit through cohabitation can result in the termination of alimony.

## B.

Defendant next challenges the evidential support for the judge's factual finding that she received a significant economic benefit from cohabiting with Stein, warranting the termination of her alimony award. Defendant asserts her monthly contribution to the joint account, in a sum equal to the amount she received as support from plaintiff, coupled with proof of annual expenses exceeding the provided support, proved she paid her own way, without Stein's economic assistance. We disagree.

Unquestionably, quantifying whether a dependent spouse receives a benefit from cohabitation is a fact—sensitive determination. Moreover, the impact of a determined economic benefit—whether alimony is terminated, reduced, or not affected—also rests on the evidence in each case. Just as an alimony award is a discretionary determination based on the economic facts and other circumstances defined in *N.J.S.A.* 2A:34-23, so too, Family Part judges must make findings regarding whether the aid provided by a cohabitant has altered or obviated the need for support, and exercise reasonable discretion to reset or eliminate alimony. We now address considerations guiding a trial court's review of these issues.

When examining the cohabiting household, a trial judge starts with a review of the parties' financial arrangements, to discern whether the cohabitant actually pays or contributes toward the dependent spouse's necessary expenses, such as housing, food, clothing, transportation, or insurance. If so, the cohabitant provides the dependent spouse with a direct economic benefit.

Further, indirect economic benefits, which benefit the dependent spouse, must be considered, including the cohabitant's payment of his or her own expenses. A clear example occurs when a dependent spouse moves into the home of the cohabitant. Although the cohabitant continues to pay pre-existing, personal housing obligations, the dependent spouse would be relieved of the need to expend funds for housing expenses.

More subtle economic benefits also may result from the parties' intertwined finances. When each party to the relationship has discrete, defined expense obligations, the individual economic responsibilities are set. However, when the parties' financial obligation arrangements are comingled, blurring the demarcation of economic responsibility, subsidization of expenses by one party for the benefit of the other may occur, *Boardman, supra,* 314 *N.J.Super.* at 347, 714 *A.*2d 981, and the ability to prove economic independence may diminish or possibly disappear.

 Defendant insists Stein provided gifts and luxuries that do not equate to an economic benefit because such displays of generosity did not ease her everyday economic needs. We reject this view and hold the provision of emoluments, which enhance a dependent spouse's lifestyle, also equates to a tangible economic benefit from the new living arrangement. Accordingly, when determining whether an economic benefit is realized from cohabitation, it is fair and equitable for the trial judge to consider lifestyle enhancements realized from the new relationship, which raise the dependent spouse's standard of living above that enjoyed during the marriage.

 Here, the record unquestionably supports the trial judge's findings that defendant's and Stein's finances were not discrete, but rather intertwined, and that defendant received an economic benefit from cohabitation. Stein paid defendant's direct and indirect expenses as well as provided lifestyle enhancements.

Although defendant and Stein suggested they separated their respective financial obligations, testimonial evidence failed to support this assertion. The lack of reconciliation of the joint checking account payments or monthly credit card bills to analyze who spent what and who paid what, made it impossible to decipher the actual obligations defendant or Stein satisfied. The unscientific system based on what defendant, by her own admission, thought was fair, does not prove she paid her discrete expenses. Rather, it supports the trial judge's findings of an intertwined, ill-defined system of expense allocation and payment, resulting in Stein paying more than his share.

When defendant and Stein joined their households, they established a formula to bear the cost of the home and its renovations, agreeing defendant would pay four-sevenths and Stein three-sevenths. As stated, the rationale for this disparate division related to the number of people in each of the combined families. Despite initial recognition of the disproportionate household membership, defendant and Stein subsequently decided to "equally" contribute to the joint account used to pay the mortgage, real

estate taxes, and home repairs. Defendant disregarded the legally defined ownership interests set forth on the deed in favor of equalizing costs. Accordingly, each month, Stein overpaid his share of these expenses, which added to defendant's real estate equity.

It is also important to note defendant, for the most part, wrote all checks from the joint account. This gave her the discretion to label expenses as "joint" or "personal." Everyday expenses—e.g., household goods and furniture, food, sundries, utilities, domestic help, lawn care, and gasoline—were to be "equally" paid, regardless of who incurred them. All five children's reoccurring expenses, like haircuts, clothing, lunches, school needs, entertainment, medical costs and the like, were divided equally. Defendant could not explain the rationale for why she and Stein contributed similar sums even though the expenses of each family, just by virtue of their difference in size, were dissimilar. Stein's disproportionate payment of these expenses further reduced defendant's economic burden.

Moreover, although the system required equal payment of joint expenses, it excluded those joint expenses charged on the joint American Express card. Stein testified he compensated for joint expenses he individually satisfied by withholding some monthly contributions to the joint checking account. However, both experts, after assuming an equal division of joint costs, concluded Stein overpaid those joint expenses by $146,000 during the three-year period under review. If expenses were to be satisfied in relation to who incurred them, Stein's overpayment was projected to be significantly greater.

In addition to Stein's disproportionate payment of joint expenses and complete satisfaction of the American Express credit card bills that included some joint expenses, he also provided car, health, and possibly homeowner's insurance;[4] purchased automo-

---

[4] *Stein testified he alone paid the bill to USAA, which he knew was the* homeowner's insurance carrier. He later stated the bill might be for car

biles for use by defendant and her children; paid the cost of vacations taken by the combined families that, at times, included the children's friends; and shouldered the bulk of restaurant and entertainment expenses.

The quantum of funds expended by Stein satisfied defendant's and the children's daily needs. Stein contributed more than his ownership share of the mortgage and taxes, paid more than half of the "joint" expenses, and directly provided cars and insurance, all of which relieved defendant of the economic burden of these necessary items for her and the children. The facts unequivocally establish defendant's direct and indirect receipt of economic benefits resulting from cohabitation.

Further, documentary and expert evidence amply demonstrated Stein's provision of expenses that enhanced defendant's lifestyle above that enjoyed during the marriage. It was undisputed that defendant would not have been able to purchase or continue to maintain the Port Washington home without Stein's contribution. She also acknowledged his provision of extravagant vacation experiences and other luxuries beyond what she had enjoyed during the marriage.

Taken together, the facts demonstrate significant direct and indirect economic benefits flowed from Stein to defendant, along with the provision of lifestyle enhancements. The record supports the trial judge's findings that not only was defendant able to be relieved of certain costs and expenses, she also was able to augment her standard of living.

■ Next, we reject defendant's contention her annual expenditures justify the continued need for support. Reduced to its essence, she maintains she spent the monies she received in support to satisfy her and the children's needs; therefore, she demonstrated a continued need for alimony. The level of defen-

---

insurance because he believed the cost of the homeowner's insurance was included within the monthly mortgage payment.

dant's annual spending does not negate the fact that she received an economic benefit from cohabitation.

While the record shows defendant spent a great deal of money each year, it does not prove she separately paid her and the children's expenses with no financial assistance from Stein. The unequivocal testimony verified the combined family operated as a single household that did not separate the financial responsibilities of defendant from those of Stein. Moreover, defendant's lifestyle was Stein's lifestyle, enhanced by Stein's provision of luxuries via gifts and vacations, the shouldering of a disproportionate share of "joint" expenses, and the complete satisfaction of other costs for her sole benefit. The lifestyle enjoyed by defendant and Stein, evinced by the house they lived in, cars they drove, vacations they took, purchases they made, and the nature and level of expenses they incurred, far exceeded what was enjoyed by defendant and plaintiff during their marriage. These facts support that "the economic benefit ensuring" to defendant was "sufficiently material" to justify the relief granted. *Konzelman, supra,* 158 *N.J.* at 196, 729 *A.*2d 7.

 We turn to defendant's alternative argument that alimony should be reduced, not terminated. Defendant argues remand is necessary because the judge failed to find the amount of Stein's economic support. She contends alimony was erroneously terminated, and should have been reduced in proportion to the amount of contribution by Stein.

The court's struggle to more precisely quantify the amount of the benefit defendant received as a result of cohabitation resulted not from a failure to sift through the evidence presented, but from an actual deficit in the proofs. We cite several reasons supporting this conclusion.

First, defendant herself was uninformed about her needs, insisting her accountant completed her CIS. She had no knowledge of the nature or amount of her expenses or those Stein paid on his credit cards. Illustrative of this point, she included a monthly car

payment, yet Stein testified he paid the car lease and purchased the automobiles used by defendant and the children.

Second, by defendant's admission, there were no reviews to determine joint versus personal expenses. Expenditures were not made in accordance with an identified party's obligation, but arbitrarily bottomed on "what was right in [defendant's] mind and . . . heart."

Third, although the experts combed through voluminous documents evincing household expenses over the three-year period, their conclusions were of limited assistance to the court. The judge rejected both expert opinions as unreliable because they were bottomed on flawed assumptions. Plaintiff's expert included Stein's personal business investments when calculating the annual household expenses, and defendant's expert failed to include Stein's undisputed provision of items such as insurance, entertainment, and automobiles. Accordingly, the judge declined to credit the expert testimony presented by either party. *See Brown v. Brown*, 348 *N.J.Super.* 466, 478, 792 *A.*2d 463 (App.Div.) (holding a trial judge may accept or reject an expert's opinion in its entirety, or may accept only some of the expert's opinion) (citation omitted), *certif. denied*, 174 *N.J.* 193, 803 *A.*2d 1164 (2002). *See also Todd v. Sheridan*, 268 *N.J.Super.* 387, 401, 633 *A.*2d 1009 (App.Div.1993) (stating an expert's opinion is "entitled to no greater weight than the facts and reasoning upon which it [was] based").

Finally, defendant has the burden to prove she did not benefit economically from sharing a household with Stein. *Ozolins, supra*, 308 *N.J.Super.* at 248, 705 *A.*2d 1230. She failed to do so.

In this regard, we note the discretionary determination to modify or terminate alimony is informed by more than the objective calculation of the specific monies provided by the cohabitant. We recognize cohabitation relations take various forms. Some may be informal and fleeting while others may be long-standing

and interdependent mirroring a marriage. In determining whether an award of alimony continues to be "fit, reasonable and just," *N.J.S.A.* 2A:34-25, the court must consider the characteristics of the new relationship of the dependent spouse and the cohabitant. Considerations that may be weighed when making such a determination include the length of cohabitation; the duration of receipt of the economic benefits, particularly in light of the length of the prior marriage; and whether the committed cohabiting relationship exhibits the indicia of marriage.

Here, defendant failed to establish her economic self-sufficiency. Interestingly, despite arguing Stein's aid was limited, she did not and now does not attempt to quantify his contributions. Further, defendant and Stein commenced cohabitation in 1998. At this point, their relationship has surpassed the length of the marriage. Throughout this time, Stein paid defendant's expenses and augmented her standard of living. The facts showed the combined families operated as a single household, with defendant and Stein committed to each other economically, devoted to each other emotionally, and faithful to their monogamous union. Considering the totality of the evidence, we find no error in the order terminating alimony.[5]

## C.

Defendant also argues the trial court erred as a matter of law by rejecting the application of laches to bar plaintiff's request. She asserts plaintiff had full knowledge she and Stein were cohabiting but did not raise the issue. We do not agree plaintiff's failure to seek termination of alimony sooner equates to his "acquiesce[nce] to [defendant's] continued right to receive perma-

---

[5] We decline to address whether a future right to alimony may arise. The argument improperly seeks a declaratory determination regarding an issue that is not ripe for resolution. *See Indep. Realty Co. v. Twp. of N. Bergen*, 376 *N.J.Super.* 295, 300, 870 A.2d 637 (App.Div.2005) (stating interests of justice do not require appellate courts to render advisory opinions where parties cannot determine the issue will arise).

nent alimony despite her cohabitation with Mr. Stein[,]" thereby allowing defendant to believe plaintiff accepted the situation and was content to continue paying for her support.

■ "[L]aches is the failure to assert a right within a reasonable time resulting in prejudice to the opposing side." *Clarke v. Clarke ex rel. Costine,* 359 *N.J.Super.* 562, 570, 821 *A.*2d 104 (App.Div.2003) (citing *L.V. v. R.S.,* 347 *N.J.Super.* 33, 39, 788 *A.*2d 881 (App.Div.2002)). "The key factors include the length of delay, reasons for delay, and change of position by either party during the delay." *Ibid.* (citing *L.V., supra,* 347 *N.J.Super.* at 39, 788 *A.*2d 881). The last criterion is critical. So, for instance, in *Clarke,* where the former wife did not file a motion for enforcement of support for more than twenty years, we held the doctrine of laches did not bar her present claim for alimony because there was no evidence her former husband changed his position or was prejudiced by the delay. *Ibid.*

■ That rationale applies equally to this case. Defendant failed to prove she changed her position based upon a belief plaintiff accepted an obligation to continue her support regardless of changes in facts or circumstances. The record is completely void of support for defendant's suggestion she decided not to complete her master's degree and obtain employment because she relied on plaintiff's decision not to seek modification once he learned of her cohabitation. There is no testimonial evidence or even inferential statements supporting such a contention, which we find meritless. *R.* 2:11-3(e)(1)(E). We find no inequity in the judge's denial of defendant's position, based on her long-standing cohabitation and established economic benefit.[6] *L.V., supra,* 347 *N.J.Super.* at 39, 788 *A.*2d 881.

---

[6] In her brief, defendant interchangeably argues equitable estoppel and laches. "To establish a claim of equitable estoppel, the ... party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act

## D.

Finally, defendant argues the court abused its discretion by retroactively terminating her alimony award as of November 13, 2009, resulting in her obligation to repay an approximate $150,000 overpayment. She contends the date of the order should govern. Plaintiff's cross-appeal urges the correction of the effective date of the order to an earlier date, when plaintiff's motion was filed. We find no abuse of discretion in rejecting each party's position. We will however, correct the effective date to coincide with the date of ordered emancipation of the oldest child, September 21, 2009.

The Family Part has discretion to terminate alimony retroactively. *See Walles v. Walles,* 295 *N.J.Super.* 498, 514, 685 *A.*2d 508 (App.Div.1996) (stating a "retroactivity decision is left to the sound discretion of the trial judge" (citing *Brennan v. Brennan,* 187 *N.J.Super.* 351, 357, 454 *A.*2d 901 (App.Div.1982))). Appellate review of such a determination considers whether the trial judge abused her discretion. *Ibid.*

Plaintiff filed his motion to terminate alimony in August 2008. Approximately eighteen months later, the plenary hearing commenced, and, upon its completion, the trial judge did not render a decision for roughly eight months. Unfortunately, a total of three years lapsed between the motion's filing and the final order, entered on June 6, 2011.

The trial judge terminated alimony effective on the date the oldest child was determined emancipated. The judge reasoned if the earlier motion filing date was used as urged by plaintiff, defendant would suffer prejudice because she had no prior notice

---

so as to change his or her position to his or her detriment." *Miller v. Miller,* 97 *N.J.* 154, 163, 478 *A.*2d 351 (1984) (citations omitted). The party asserting estoppel bears the burden of proof. *Ibid.* (citing *Lawes v. Lynch,* 7 *N.J.Super.* 584, 593, 72 *A.*2d 414 (Ch.Div.), *aff'd,* 6 *N.J.* 1, 76 *A.*2d 885 (1950)). No facts support intentional conduct or statements by plaintiff in this regard, obviating application of equitable estoppel.

and provided her share of the oldest child's college expense expecting to use, in part, her alimony receipts. Using the emancipation date, which was after the filing date of plaintiff's motion, allowed defendant to adjust her finances and file any further applications. Throughout the three years this issue remained pending, defendant continued to provide the same percentage of the two younger children's college expenses without abatement. She asserts she is now prejudiced because she fulfilled an agreement regarding payment of college costs that was based on income including receipt of alimony.

We decline to address defendant's argument that her previous consensual contribution toward the two younger children's college costs should have been reduced or eliminated were she not receiving alimony. While conceptually the argument sounds logical, the issue was not reviewed by the trial court. Consequently, this record contains insufficient evidence to allow the requisite analysis. Defendant must first present her request to the trial court for review and determination. She remains free to seek post-judgment relief as warranted to correct this perceived inequity.

We determine the trial judge's rationale for rejecting both parties' positions and instead using the emancipation date weighed the parties' positions and considered the resultant effect if the date were fixed as each had requested. We determine no abuse of discretion occurred and will not disturb the order.

## E.

Defendant believes the denial of her request for counsel fees was erroneous. We disagree.

Pursuant to *N.J.S.A.* 2A:34-23,

[w]henever [an] . . . application is made to a court which includes an application for . . . counsel fees, the court shall determine the appropriate award for counsel fees, if any, . . . consider[ing] the factors set forth in [*Rule* 5:3-5], the financial circumstances of the parties, and the good or bad faith of either party.

Also, *Rule* 5:3–5(c) allows the court to award counsel fees to "any party successful in the action, on any claim for . . . alimony[.]" In determining whether to award attorney's fees, the court should consider:

(1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

[*Ibid.*]

*See also Addesa v. Addesa,* 392 *N.J.Super.* 58, 78, 919 *A.*2d 885 (App.Div.2007) (same).

Although not specifically enumerating every factor identified in the court rule and statute, the judge recited the support for her determination. She found each party had sufficient ability to satisfy his or her attorney's fee obligation, and neither had proceeded in bad faith, but rather presented reasonable positions. These factual findings adequately justify the denial of defendant's application for counsel fees.

F.

Any additional issues raised by defendant, but not specifically addressed in our opinion, were found to lack sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

IV.

The June 6, 2011 order is affirmed. The order dated September 27, 2011, is affirmed as amended, except that the matter is remanded to correct the ordered effective date, which shall be September 21, 2009.