**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4068-17T2

WENDY S. WOOD,

     Plaintiff-Respondent,

v.

ALAN R. WOOD,

     Defendant-Appellant.

_____

        Argued March 18, 2019 – Decided May 16, 2019

        Before Judges Gooden Brown and Rose.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-1788-15.

        Marybeth Hershkowitz argued the cause for appellant (Cores & Associates, LLC, attorneys; Amy Sara Cores and Marybeth Hershkowitz, on the briefs).

        Risa M. Chalfin argued the cause for respondent (Wilentz, Goldman & Spitzer, PA, attorneys; Joseph J. Russell, Jr. and Risa M. Chalfin, of counsel and on the brief).

PER CURIAM

In this post-judgment matrimonial matter, defendant (ex-husband) appeals from a March 29, 2018 Family Part order, denying his motion to terminate his alimony obligation to plaintiff (ex-wife) based on cohabitation, and awarding plaintiff counsel fees. Defendant raises the following points for our consideration:

> POINT I: THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO FIND COHABITATION BETWEEN PLAINTIFF AND HER PARAMOUR AND FAILED TO GIVE PROPER WEIGHT TO THE FINANCIAL ENTANGLEMENTS OF . . . PLAINTIFF AND [HER PARAMOUR].
>
> POINT II: TRIAL COURT IMPROPERLY SHIFTED THE BURDEN TO . . . DEFENDANT TO PROVIDE EVIDENCE OF PLAINTIFF'S FINANCIAL ENTANGLEMENT WITH HER LIVE[-]IN PARAMOUR.
>
> POINT III: THE TRIAL COURT ERRED IN FAILING TO ORDER A PLENARY HEARING WITH RESPECT TO THE ISSUE OF COHABITATION.
>
> POINT IV: THE TRIAL COURT MISAPPLIED ITS DISCRETION IN AWARDING PLAINTIFF COUNSEL FEES AND SHOULD BE REVERSED.

Having considered the arguments and applicable law, we affirm.

A-4068-17T2

The parties married in 1993 and divorced in 2016. Two daughters were born of the marriage, A.W.,[1] born in 1995, and T.W., born in 1996. Both children were emancipated at the time of the divorce. Plaintiff also had a son, C.H., born in 1989 from a prior relationship. Under the parties' property settlement agreement (PSA), which was incorporated into their September 15, 2016 final judgment of divorce (FJOD), defendant agreed to pay plaintiff $525 per week in limited duration alimony for a period of ten years, effective September 13, 2016, the date the PSA was executed. Under the PSA, defendant's "obligation to pay alimony shall terminate" upon plaintiff's "remarriage" or the "death" of either party or "[i]n accordance with [N.J.S.A.] 2A:34-25[.]" Further, alimony could be "modified or terminated in accordance with N.J.S.A. 2A:34-25 and . . . existing case law."

In executing the PSA, the parties were both represented by counsel, accepted the agreement as fair and reasonable, and acknowledged entering into the PSA voluntarily. The parties also agreed that if either party "fail[ed] to abide by the terms of th[e] [PSA], the defaulting party w[ould] indemnify the other for all reasonable expenses and costs, including counsel fees, incurred by the other in successfully enforcing th[e] [PSA]."

---

[1] We refer to the parties' children by their initials to protect their privacy.

On December 6, 2017, defendant moved to terminate or suspend his alimony obligation based on plaintiff's purported cohabitation. In the alternative, defendant sought a finding that he had established a prima facie case of changed circumstances, entitling him to a plenary hearing with appropriate discovery. Defendant also requested counsel fees. To support the motion, defendant provided an updated case information statement (CIS), and certified that "[i]n the Fall of 2016," he learned "that [p]laintiff was living with [her] boyfriend, K.C." As a result, defendant "hired [a] private investigator . . . to confirm and document the cohabitation."

In the November 17, 2017 cohabitation report attached to defendant's certification, the investigator indicated that based on a computer search of current public records, K.C.'s name was associated with both the marital residence, which was foreclosed upon and sold in the Spring of 2016, and plaintiff's current residence, a condominium unit located in Howell (the condominium). According to the investigator, K.C., then fifty-three years old, changed his address on his driver's abstract and voter registration profile to reflect the condominium address on January 26, 2017, and November 2, 2016, respectively.

A-4068-17T2

The investigator conducted two rounds of surveillance of the condominium on non-consecutive days from March 8 to April 6, 2017, and from August 23 to November 17, 2017, the results of which were detailed in the report. During the first round of surveillance, on the morning of April 6, 2017, the investigator observed a 5' 10," 165 pound adult Caucasian male, "presumed to be . . . K.C.[,]" inside the condominium. During the second round of surveillance, K.C. was observed at the condominium "in the early morning and afternoon hours on [fourteen] out of [fourteen]" occasions.

The investigator summarized the results of the second round of surveillance as follows:

> The surveillance revealed that . . . K.C. typically leaves [the condominium] at 5:00 [a.m.] and walks to a nearby bus stop. He has been observed boarding bus number 139 with a banner that reads "New York via Freehold Mall[.]" One morning, when it was raining heavily, [plaintiff] and . . . K.C. left [the condominium] together at approximately 5:25 [a.m.]
>
> Our office has also observed . . . K.C. come off the bus typically at 3:15 [p.m.] On several occasions, [plaintiff] would pick up . . . K.C. at the bus stop and on one[] occasion, he was greeted with a kiss from [plaintiff]. On other days, . . . K.C. was observed walking from the bus stop to [the condominium]. On all occasions, . . . K.C. was observed using his own set of keys to enter [the condominium]. . . . K.C. was also observed accessing the locked mailbox with a key without being in the presence of [plaintiff].

5

Despite reportedly observing plaintiff and K.C. kiss on two separate occasions, the investigator was unable to obtain surveillance footage due to the brevity of the interaction. The two were also observed driving to Robert Wood Johnson University Hospital in New Brunswick on one occasion. Based on the investigation, the investigator concluded that plaintiff was "permanently cohabiting" and "engaging in a romantic relationship" with K.C.

Plaintiff opposed defendant's motion and cross-moved for an order holding defendant in violation of litigant's rights for failing to comply with various provisions of the PSA, including missing alimony payments. Plaintiff also sought counsel fees in accordance with the indemnification provision of the PSA. In a supporting certification, plaintiff denied "cohabitating." She certified that K.C. was "a roommate" who lived with her because she could not "afford to live by [her]self on the alimony," she was "unable to work" due to "[her] multiple disabilities[,]" which "include[d] brain cancer, multiple sclerosis, transverse myelitis, and a seizure disorder[,]" and she had not yet received any disability benefits.

According to plaintiff, when the marital residence "was foreclosed upon" and she "started looking for a comfortable, safe, one-bedroom residence" with "wheelchair accessib[ility]," she "learned that [she] did not have sufficient

income or income history to qualify for a rental[.]" K.C., an "acquaintance[,] . . . was also looking for a place to live" and "asked . . . if [she] wanted to be roommates." She agreed and they "rented a two-bedroom condominium together and signed separate leases on October 7, 2016[,]" for which she paid $800 per month as her "portion of the rent."

According to plaintiff, K.C. "[paid] his share of the rent and utilities" and "occasionally help[ed] [her] carry packages to/from [her] car." She also acknowledged that she "occasionally pick[ed] [him] up . . . at the bus stop that [was] about [a] five minute walk from [the condominium] because he does not have a car . . . and it [was] convenient for [her]." However, she denied any financial entanglements or that they were "in a romantic relationship" or "a mutually supportive, marriage-like relationship." On the contrary, she asserted that their "finances [were] not combined[,]" and that she paid for her own "groceries," "medical expenses," "transportation expenses and daily living expenses." In addition, she and K.C. "each ha[d] . . . separate rooms," and "separate bathrooms" in the condominium.

To underscore the nature of her relationship with K.C., plaintiff pointed out that "before and after" her July 27, 2017 brain surgery, it was her "family and friends," including her children and her elderly parents, who stayed with her

7

and cared for her, rather than K.C. Plaintiff also stated that she and K.C. "do not socialize together" and "friends and family do not consider [them] a couple[,]" as evidenced by the fact that there were no "photographs of [them] together or mention of . . . K.C. in any [Facebook] posting" or "other social media."

In fact, plaintiff believed that the only time the two "spent time together outside of [the condominium] was this past Thanksgiving" when her daughter A.W. invited him to dinner at her home once she discovered "he had [no] plans for the holiday." Plaintiff provided certifications from K.C. and her son C.H., corroborating her account that she and K.C. were not romantically involved. She also supplied a lease agreement for the condominium, signed by K.C. and plaintiff, and a letter from her doctor confirming her medical conditions.

In a reply certification, defendant countered that aside from the investigator observing the two "kissing and embracing[,]" and "K.C. accompanying plaintiff to Robert Wood Johnson Hospital[,]" both of which were indicia of a mutually supportive relationship, "[their] children have relayed to [him] that . . . K.C. [was] indeed plaintiff's longtime boyfriend." Further, during "[his] final walk through of the [marital residence]," where his investigator believed K.C. had previously lived while the divorce was finalized,

defendant had observed "male clothing . . . intermingled with plaintiff's in the master bedroom[,]" that did not belong to him. In addition, defendant pointed out that contrary to plaintiff's assertion that she and K.C. had "separate leases," the lease supplied by plaintiff showed that they were, in fact, "co-lessees."

In a supplemental certification, plaintiff responded that when the marital residence was being foreclosed upon due to defendant's failure to pay the mortgage, she offered K.C. a spare bedroom in the home for $300 per month in rent in order to obtain funds to pay the utilities. However, she denied that any male clothing was in her bedroom when defendant conducted his walk through. In support, plaintiff submitted her daughter A.W.'s certification, because A.W., as well as C.H., were also living in the marital residence at the time. A.W. confirmed that plaintiff was "not romantically involved" with K.C., that she never told defendant that K.C. was "romantically involved" with plaintiff, and that when K.C. rented a room in the marital residence, he never slept nor kept clothing in her mother's bedroom. A.W. also confirmed that she invited K.C. to Thanksgiving dinner after "learn[ing] that he did not have any plans" for the holiday.

In her supplemental certification, plaintiff also explained that while K.C. had driven her to her hospital appointment one time "approximately one month

following [her] brain surgery[,]" it was "a simple favor[,]" and not indicative of "a 'mutually supportive' relationship." Moreover, she denied ever "romantically kiss[ing] or embrac[ing]" K.C. Further, because K.C. weighed between 265 and 300 pounds, plaintiff asserted that the investigator may have mistaken observing her son C.H., who was, in fact, 5'10" and 165 pounds, for K.C. in the condominium on April 6, 2017, and the "inaccuracy cast[ed] doubt as to whether the . . . investigator was confused about [her] son and . . . K.C. at other times."

Following oral argument, on March 29, 2018, Judge Andrea Marshall denied defendant's motion and awarded plaintiff counsel fees, among other relief. In her statement of reasons, relying on Lepis v. Lepis, 83 N.J. 139 (1980), Crews v. Crews, 164 N.J. 11 (2000), and N.J.S.A. 2A:34-23(n), the judge acknowledged that a "dependent spouse's cohabitation with another" constituted "changed circumstances" warranting modification or termination of alimony "[e]ven if a PSA does not expressly provide for the cessation of alimony payments upon cohabitation[.]"[2] Further, "[o]nce a prima facie showing of changed circumstances [was] made, the court may order further discovery" and,

---

[2] In her supplemental certification, plaintiff had asserted that even if she was cohabitating, defendant's request was not supported by their PSA which "clearly state[d] the conditions upon which [d]efendant [could] request termination of alimony" and "[c]ohabitation [was] not one of the conditions."

"[u]pon the completion of discovery . . . , in its discretion, . . . hold a plenary hearing." However, the judge noted that "[t]he moving party [bore] the burden of showing changed circumstances that warrant[ed] modification or termination" and "[a]bsent a prima facie showing of changed circumstances, courts should not order discovery of a spouse's financial status" or conduct "a plenary hearing" unless "material facts are 'in genuine dispute.'"

Additionally, the judge explained that "[c]ohabitation involve[d] a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union." Relying on Konzelman v. Konzelman, 158 N.J. 185, 202 (1999), the judge acknowledged that "a finding of cohabitation" was "based on those factors that ma[d]e the relationship close and enduring and require[d] more than a common residence, although that [was] an important factor." Rather, the factors to be considered included, but were not limited to, "living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle." See ibid.; see also N.J.S.A. 2A:34-23(n). Further, while consideration of "the length of the relationship" was necessary, the judge noted

that "[t]he definition of cohabitation [was] flexible and specific to the particular circumstances involved."

Before applying these well-settled legal principles to the facts of the case, the judge summarized the parties' submissions as follows:

> Defendant asserts that . . . [p]laintiff is romantically involved with . . . K.C. and they maintain a household together. Defendant also states that . . . K.C. lived at the former marital home for a period of time . . . . Plaintiff concedes that she is living with . . . K.C. but only as roommates because she cannot afford her own rental. Plaintiff asserts that she and . . . K.C. signed separate leases. However, the lease included in her application . . . shows a single lease with both [p]laintiff and . . . K.C.'s signatures. As such, there is some indicia of joint responsibility for living expenses, at least rent.

The judge then determined:

> Defendant has provided no indication of . . . [p]laintiff's financials that would support his assertion that there has been cohabitation. Further, [d]efendant references Facebook posts and pictures that show [p]laintiff and . . . K.C. behaving as a couple, but does not provide any evidence of same in [his] application. [Also,] [d]efendant points to two specific instances of kissing and embracing in the investigative report to support his allegation that [p]laintiff is in an intimate personal relationship with . . . K.C. However, the instances . . . were characterized as too brief for the investigator to take a photograph of same. In sum, [d]efendant has failed to support his claim on a prima facie basis that [p]laintiff is cohabitating with . . . K.C. in accordance with Lepis or N.J.S.A. [2A:34-25]. Therefore, [d]efendant's requests to terminate or suspend his

alimony obligation are denied.  Further, [d]efendant's request to conduct a plenary hearing, [and] conduct discovery . . . [is] denied without prejudice.

Turning to plaintiff's cross-motion, the judge granted plaintiff's request to hold defendant in violation of litigant's rights for failing to comply with two provisions of the PSA.  Specifically, the judge found that defendant missed two weeks of alimony payments, and failed to turn over to plaintiff the entirety of his retirement account or pay his proportionate share for the preparation of the necessary qualified domestic relations order as required under the PSA, none of which defendant disputed.

Finally, the judge addressed both parties' requests for counsel fees and acknowledged that both parties had provided certifications of services from their respective counsel as required by Rule 4:42-9(b).  However, relying on Mani v. Mani, 183 N.J. 70, 94 (2005), and applying the factors enumerated in Rule 5:3-5(c), the judge denied defendant's request, and ordered him to pay plaintiff partial counsel fees in the amount of $500.

The judge explained:

> It appears that . . . [d]efendant . . . earns a higher income than . . . [p]laintiff.  Plaintiff asserts that she has a limited income due to her health.  Plaintiff appears to be acting in good faith to enforce the terms of the parties' PSA.  Defendant's good faith is somewhat questionable.    While    his    requests    concerning

13

cohabitation seem to be brought in good faith, he appears to be neglecting some of his obligations under the terms of the PSA.

The judge also referred to "the indemnification provision" in the PSA and, given plaintiff's success in enforcing the PSA's provisions, concluded that the Rule 5:3-5(c) factors, as well as the indemnification provision "support[ed] an award" of counsel fees to plaintiff. The judge entered a memorializing order and this appeal followed.

On appeal, defendant argues the judge erred in finding that he failed to "establish[] a prima facie case of cohabitation" in order to shift "the burden . . . to plaintiff to show her continued need for alimony." According to defendant, because it was undisputed that plaintiff was living with someone, "at the very least," he was "entitled" to "the discovery that accompanies a plenary hearing[,]" without which he had no "ability to obtain the financial information that plaintiff [was] under no obligation to provide." Defendant continues that the judge "should have granted [his] request for a plenary hearing based on the fact that the certifications created material issues of disputed facts relevant to the issue of cohabitation." Additionally, defendant contends that "[i]n granting . . . plaintiff counsel fees, the [judge] erroneously made findings of fact that were either not supported by the record or directly contrary to the record."

After carefully reviewing the record, we reject defendant's contentions and affirm substantially for the reasons expressed by Judge Marshall in her comprehensive and well-reasoned statement of reasons. Judge Marshall's factual findings are "supported by adequate, substantial, credible evidence" in the record, considering our "limited" scope of review, and the deference we accord "to family court [fact-finding]." Cesare v. Cesare, 154 N.J. 394, 411-13 (1998). We are also satisfied that Judge Marshall's legal conclusions, which are subject to our plenary review, see Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007), are sound. Further, we discern no abuse of discretion in the judge's award of counsel fees. See Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) ("We will disturb a trial court's determination on counsel fees only on the 'rarest occasion[s],' and then only because of [a] clear abuse of discretion." (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995))). We add only the following comments.

Trial courts are afforded wide discretion when deciding motions to modify alimony obligations. Reese v. Weis, 430 N.J. Super. 552, 572 (App. Div. 2013). Such discretion, however, "is not unguided or uncontrolled." Id. at 572 (quoting Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 202 (App. Div. 1997)). Given the wide, but not unlimited discretion of trial courts in such

A-4068-17T2

matters, our review is limited "to whether the court made findings inconsistent with the evidence or unsupported by the record, or erred as a matter of law." Ibid.

Procedurally, an alimony payor who alleges cohabitation must first present a prima facie case that his or her former spouse is in such a cohabiting relationship tantamount to marriage. See Gayet v. Gayet, 92 N.J. 149, 154-55 (1983). If such a prima facie showing is made, the disputing ex-spouses may then engage in mutual discovery. See ibid. The payor's prima facie showing of cohabitation creates a rebuttable presumption of changed circumstances, which the dependent ex-spouse may then attempt to rebut "with proof that the need for [spousal] support remains the same." Ozolins v. Ozolins, 308 N.J. Super. 243, 248-49 (App. Div. 1998); see also Reese, 430 N.J. Super. at 570-71 (reaffirming this court's holding in Ozolins).

Here, the record amassed by defendant was reasonably deemed insufficient by the judge to rise to the level of a prima facie case that would justify the additional discovery sought by defendant. While our Supreme Court has characterized "a common residence" as "an important factor" in establishing cohabitation, it has not determined that a common residence alone establishes a

A-4068-17T2

prima facie case, and we reject defendant's invitation to do so here. <u>Konzelman</u>, 158 N.J. at 202.

That being so, the judge did not misapply her authority in declining defendant's request for discovery or a plenary hearing, particularly since defendant's request in that regard was denied without prejudice. <u>See</u> <u>Shaw v. Shaw</u>, 138 N.J. Super. 436, 440 (App. Div. 1976) ("It is only where the affidavits show that there is a genuine issue as to a material fact, and that the trial judge determines that a plenary hearing would be helpful in deciding such factual issues, that a plenary hearing is required."). Thus, defendant is not foreclosed from any future attempt to establish a prima facie case of cohabitation with supplemental proofs showing that plaintiff's and K.C.'s lives and finances are actually more intertwined than the present record suggests.

To the extent any argument raised by defendant has not been explicitly addressed in this opinion, it is because the argument lacks sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17