**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3554-18T1

PAMELA LOGAN,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

RONALD BROWN,

      Defendant-Respondent/
      Cross-Appellant.

_____

Argued October 1, 2020 – Decided October 22, 2020

Before Judges Fuentes, Whipple and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-1571-11.

Drew A. Burach argued the cause for appellant/cross-respondent (Archer & Greiner, PC; Drew A. Burach, of counsel and on the briefs).

Kevin A. Falkenstein argued the cause for respondent/cross-appellant (Adinolfi, Molotsky, Burick & Falkenstein, PA; Kevin A. Falkenstein, of

counsel and on the briefs; Kimberly A. Greenfield, on the briefs).

PER CURIAM

Plaintiff Pamela Logan appeals from a March 15, 2019 Family Part order granting defendant Ronald Brown's post-judgment motion to terminate permanent alimony and his life insurance obligation based on plaintiff's cohabitation effective January 1, 2017. Defendant cross-appeals, claiming the judge should have terminated alimony in mid-2014. Both parties appeal the $20,000 counsel fee award to defendant's counsel. For the reasons that follow, we affirm the termination of alimony and life insurance obligations and reverse and remand as to the award of counsel fees.

I.

The parties were divorced in 2012 after a twenty-two-year marriage. They have one daughter, Madison, who is emancipated.[1] As part of their Property Settlement Agreement (PSA) incorporated into the judgment of divorce, defendant agreed to pay plaintiff permanent alimony of $400 weekly and maintain a life insurance policy designating plaintiff as the beneficiary in the amount of $200,000 to secure the obligation. At the time of the divorce, plaintiff

---

[1] At oral argument, counsel confirmed Madison is emancipated although no order has been entered to this effect.

A-3554-18T1

was employed by Alpine Brokerage Services earning $10 per hour. She agreed to an annual imputed income of $20,800. Defendant worked for International Paper and earned $84,525 annually.

The PSA stated defendant's permanent alimony "shall terminate" upon plaintiff's death, defendant's death, plaintiff's remarriage, or by mutual consent of the parties. Section 28(h) of the PSA addressed cohabitation:

> Additionally, said permanent alimony shall be modifiable upon a showing of any other permanent and substantial change in circumstance sufficient to warrant a modification of the permanent alimony under the then controlling case and statutory law. Wife's cohabitation with an unrelated adult individual may constitute a change of circumstances consistent with the law then in effect based upon the then facts and then controlling case and statutory law.

After the divorce, plaintiff vacated the former marital home and moved to an apartment in Mount Laurel. According to Madison, plaintiff started seeing A.V.[2] soon after the parties separated in 2011. In 2012, plaintiff referred to A.V. as her "boyfriend" and visited him "most weekends." In July 2014, plaintiff moved out of the Mount Laurel apartment and left her part-time job. She purchased a historic 448 square foot home in Wiscasset, Maine referred to as the "tiny house." Madison testified that after she graduated high school in 2014,

---

[2] We use initials to protect the confidentiality of third parties. R. 1:38-3(d)(2).

plaintiff moved to A.V.'s cabin in Wiscasset prior to purchasing the tiny house. Using a rented van, Madison and two family members helped move plaintiff's belongings out of her Mount Laurel apartment to A.V.'s basement. One mattress and a bedframe were moved to Madison's aunt and uncle's house in Parlin. Plaintiff claimed she lived with her sister and brother-in-law in Parlin until she moved into the tiny house and visited A.V. in the interim.

Madison testified she received financial aid during each of her four years attending Stockton University and that she and plaintiff represented on financial aid forms that they lived at her aunt and uncle's home in Parlin. However, at the hearing, Madison testified that neither she nor her mother ever lived in Parlin, and the financial aid forms were inaccurate.

Between 2014 and 2018, Madison visited plaintiff at A.V.'s log cabin four or five times and stated that plaintiff "stayed in Maine the majority of the time." They celebrated Christmas together at A.V.'s cabin. Madison testified that plaintiff slept in A.V.'s bedroom and that her clothing, pictures, and personal belongings were at his house. Madison also testified plaintiff wears an engagement ring and that she purchased a ring for A.V. Plaintiff refers to A.V. as her "perpetual fiancé" and lives in the tiny house located about a mile away from A.V.'s log cabin.

After Madison told defendant she helped plaintiff move to Maine, he and his current wife N.B. researched the internet and other sources. They found two Wiscasset newspaper articles published in 2016. One article stated, "Logan's fiancé [A.V.] said the $40,000 in improvements that have gone into the [tiny house] property have enhanced the neighborhood." Another article read, "Tiny House Gets a [B]ig [F]acelift," and depicted plaintiff and A.V. standing in the front of the home with A.V. holding up wood boards. The tiny house has its own Instagram account maintained by plaintiff where defendant found numerous photographs posted in 2017 of A.V. performing home improvements to the floors, walls, entryway ceiling, chimney, and kitchen. In addition, defendant found a website promoting plaintiff's photography and listing her address as A.V.'s home. Plaintiff commented on a blog or message board, "I have a log home—I know how to care for them."

As further support of his contentions, defendant proffered two private investigator's reports dated August 13, 2017, and November 5, 2017, and a letter to N.B. dated December 18, 2017. The reports documented plaintiff having her Volkswagen Beetle "routinely parked" at A.V.'s residence, and as of August 2017, plaintiff and A.V. "appear[ed] to be wearing a ring on the ring finger of their left hand." Warren, an investigator, observed plaintiff "routinely spen[t]

her daytime hours" at the tiny house and returned to A.V.'s log cabin "periodically during and at the end of the day." More specifically, Warren testified that in October 2017, he observed "the vehicles were parked at the log cabin at the end of each day" and that he only saw plaintiff's vehicle once during the early morning hours.

Additionally, on October 21, 2017, Warren saw A.V.'s Subaru Baja parked at the tiny house in the morning while plaintiff and A.V. were at the home. Plaintiff invited Warren in for a tour. In his letter to N.B. dated December 18, 2017, Warren wrote that "[t]he kitchen [in the tiny house] . . . is not renovated and it appears to be used for storage of tools and patio furniture." Warren again noted plaintiff appeared to be wearing an engagement ring and A.V. appeared to be wearing a wedding ring.

N.B., a certified public accountant, reviewed all of plaintiff's discovery and performed a financial analysis, along with defendant. At trial, N.B. testified that she reviewed plaintiff's cell phone records, EZ Pass toll records, bank statements, and cancelled checks. N.B. concluded that based upon these records, in early 2014, plaintiff spent 28% of her time in Maine and Massachusetts, where A.V. worked, and later in 2014, plaintiff increased the time she spent in Maine to 71%. By 2015, N.B. testified that plaintiff spent 85% of her time in Maine;

6

in 2016, she spent 91% of her time in Maine; and 87% in 2017, based only on "partial data" for that year. Beginning in 2014, the majority of plaintiff's purchases were made in Maine according to N.B.

A.V.'s deposition testimony was admitted as substantive evidence at trial.[3] He testified that he is a musician, author, and professor at Berklee College of Music in Boston, Massachusetts. His log cabin is about a mile or two from plaintiff's tiny house. A.V. maintained that plaintiff was his girlfriend, they are "perpetually engaged," and are "not getting married." After attending high school together, they reconnected in 2009 or 2010 and by 2011, they began dating, seeing each other "on a weekend here and there."

A.V. paid for the couple to vacation in Hawaii in 2011 or 2012, and their travel to Quebec once a year. He "helped a lot" with the "extensive renovations" without compensation because he "love[s] working on old houses." A.V. spent about $2000 on construction materials. Several photos were posted on his Facebook page containing captions such as "we found this sweet late 1800's cameo couch and set for the house" and "we finished the wallpaper in the entryway this morning." He also admitted signing a note on the floorboards that

---

[3] See Rule 804(1)(A)(i).

read "12/15/16 Logan [A.V.]." Another handwritten note on the subfloor said, "Fender basses paid a lot for this."

According to A.V., plaintiff never resided with him in Maine but admitted she has stayed overnight at his home on occasion and stored belongings in his basement. In 2015, A.V. testified plaintiff "spent a lot of time in Maine" and spent some time there in 2016. He claimed the ring he wears on his left hand "looks like" a wedding ring but actually belonged to his brother, who died of cancer. Plaintiff used his home address once to enter a photography competition in Maine. A.V. denied that plaintiff performed any household chores for him and did pay any of his bills. He added her to his cell phone plan and pays the bill.

A.V. testified about his publishing business, DaaDoo Music, and its website. Although he claimed plaintiff did not work for him, A.V. acknowledged that she mails books to customers. Plaintiff is also "listed" on his website, which reads: "We process all orders ourselves so you can be assured that any message or personal request is being read and handled by myself or [plaintiff]." He also testified that he gave plaintiff a business credit card with her name on it in March 2016 with a $5000 credit limit. A.V. testified he "never

talk[s] about money with [plaintiff]," and he had no idea what she earned as a freelance photographer.

Plaintiff testified she is a self-employed, part-time freelance photographer. She has been dating A.V. since 2011 and lives alone at the tiny house. In May 2016, she purchased the home for $99,900 and obtained a mortgage loan for $79,920. A.V. paid for the tiny house appraisal. She admitted being engaged to A.V. and has no intention to marry him. According to plaintiff, she does not want to reside with A.V. because she wants autonomy and to "set an example for [her] daughter that she can be an independent woman." However, she claimed that she and A.V. tell people they live together for her "safety" so "outsiders" do not think she lives alone.

Before moving into the tiny house, plaintiff testified she did not live with A.V., except when renovations were underway at the tiny house, but instead lived rent-free at her sister's townhome. She also testified that her photography website listed A.V.'s address as the address for her business. However, plaintiff asserted it was "not a website that [she] maintain[ed]," and she denied using A.V.'s address for her business.

Plaintiff testified that in 2016, she spent more than half her time in Maine and by 2017, she spent the majority of her time there. The record shows plaintiff

obtained a Maine driver's license and registered her vehicle in Maine in September 2017. Plaintiff filed New Jersey State income tax returns for calendar years 2012, 2014, 2015, and 2016, listing her sister's address. In 2017, plaintiff filed New Jersey and Maine income tax returns because of her residence in Maine as of September 2017.

Plaintiff also testified that her earned income in 2018 was under $1000 and she had no earned income in 2019 at the time of trial. According to her 2018 case information statement (CIS), plaintiff earned less than $1000 in 2016 and 2017. Her CIS lists Schedule A expenses of $832 per month, Schedule B expenses of $104 per month, and Schedule C expenses of $770 per month for total monthly expenses of $1716. She received alimony of $1732.67 per month. Plaintiff testified that she pays for her mortgage, utility bills, car, and insurance premiums and paid her $20,000 share of Madison's college expenses each year in cash. Her net worth exceeded $350,000. She denied having any joint bank accounts with A.V.; pays for her own food; paid for a veterinarian bill for A.V.'s cat in 2014; and for snow removal in 2015 when A.V. was in Boston. In contrast to Warren's testimony, plaintiff testified that she only spent one night at A.V.'s house in August 2017 and one night in October 2017.

A-3554-18T1

The judge found that the parties' PSA identified cohabitation as a change in circumstances to be reviewed "under the law that is existing at the time," and therefore applied N.J.S.A. 2A:34-23(n), the 2014 statutory amendment. The statute provides alimony may be suspended or terminated based on cohabitation. In her oral decision, the judge also found that plaintiff and A.V. began their relationship in 2009 or 2010, the evidence "was overwhelmingly clear that [she] moved to Maine in the middle of . . . 2014" to be with A.V. and she did not live at her sister's house. The judge stated:

> There's literally no doubt in my mind from listening to this testimony and . . . observing these witnesses . . . . This was a fraud. She was perpetuating a fraud on [defendant] and they together were perpetuating a fraud on the government by filing FAFSA statements saying that she lived [at her sister's house] and then having the sister write that she was just so happy to have her and she was rent-free.

In addition, the judge deemed Madison's testimony to be credible and found that plaintiff only went to her sister's house "for some holidays here and there just to kind of make sure she had her foot in the door so that she could get the FAFSA, but she was never there. She was always in Maine." The judge further found that "none" of plaintiff's cell phone records, EZ Pass records, or bank statements reflected activity in New Jersey and that she did not purchase a house in Maine until 2017.

11

As to the testimony of plaintiff and A.V., the judge determined that much of their testimony lacked credibility. The judge found "some of the explanations" plaintiff gave were "wholly incredible" but added that "[e]very time [plaintiff] was asked a question about intertwining finances or staying with [A.V.] or having a ring or . . . being engaged or anything the answers were incomprehensible. They didn't make sense. They . . . strained reality."

The judge also recognized that there was "tons of social media about the two of them together" and the tiny house was "uninhabitable" as of December 2017. The judge discredited plaintiff's testimony about not sleeping at A.V.'s house and gave greater weight to Warren's testimony about repeated observations of plaintiff's vehicle parked in A.V.'s driveway:

> Every night the cars are parked at [A.V.'s] house. No, they didn't stay overnight, but they're there at midnight or 11:00 at night and then in the morning. I mean to argue that he [Warren] wasn't sitting there overnight every night to see whether she actually slept there doesn't make any sense. Where else did she sleep? Nowhere. There was nowhere to sleep.

The judge found much of A.V.'s testimony "didn't make much sense either" and was "nonsensical." In conclusion, the judge determined that plaintiff and A.V. are "a couple. They do everything together. They renovate a house together, they live together . . . she takes care of his pets and . . . helps him with

12

his website and he helps her and did this renovation in her house out of the goodness of his heart, never charged her a dime." The judge further concluded that "[t]hey share everything . . . they are each other's family." Ultimately, the judge found "[t]his is clearly not just a boyfriend and girlfriend relationship. This relationship has every indicia of a marriage other than a piece of paper."

On appeal, plaintiff argues the judge abused her discretion by terminating defendant's alimony and life insurance obligations; many of the judge's factual findings are unsupported by the record; the parties' PSA only contemplated a modification and not a termination of alimony if cohabitation occurred; N.J.S.A. 2A:34-23(n) was improperly applied; and defendant presented no proofs to support his request for reimbursement of life insurance premiums. On cross-appeal, defendant contends the judge abused her discretion by not terminating his alimony and life insurance obligations retroactive to mid-2014. Both parties appeal the award of counsel fees.

II.

We first consider the well-settled principles that guide our review. Alimony "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. To make such a modification, a showing of "changed circumstances" is required. Lepis v. Lepis, 83 N.J. 139,

146 (1980); see Weishaus v. Weishaus, 180 N.J. 131, 140-41 (2004).  In Landau v. Landau, 461 N.J. Super. 107, 108 (App. Div. 2019), we held that "the changed circumstances standards of [Lepis] continues to apply to a motion to suspend or terminate alimony based on cohabitation following the 2014 amendments to the alimony statute, N.J.S.A. 2A:34-23(n)."  Those amendments defined cohabitation as "involv[ing] a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household."  N.J.S.A. 2A:34-23(n).  To determine whether there is a prima facie showing of changed circumstances, the court must consider the terms of the order at issue and compare the facts as they existed when the order was entered with the facts at the time of the motion.  See Faucett v. Vasquez, 411 N.J. Super. 108, 129 (App. Div. 2009).

A prima facie showing of cohabitation constitutes sufficient changed circumstances under Lepis.  Gayet v. Gayet, 92 N.J. 149, 154-55 (1983).  Cohabitation has been defined as "an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage."  Konzelman v. Konzelman, 158 N.J. 185, 202 (1999).  Where a supporting spouse seeks to decrease or terminate alimony because of the

14

dependent spouse's cohabitation, "the test for modification of alimony is whether the relationship has reduced the financial needs of the dependent former spouse." Gayet, 92 N.J. at 150. Alimony may be modified "when (1) the third party contributes to the dependent spouse's support, or (2) the third party resides in the dependent spouse's home without contributing anything toward the household expenses." Id. at 153.

"[A] showing of cohabitation creates a rebuttable presumption of changed circumstances shifting the burden to the dependent spouse to show that there is no actual economic benefit to the spouse or cohabitant." Reese v. Weis, 430 N.J. Super. 552, 570 (App. Div. 2013) (quoting Ozolins v. Ozolins, 308 N.J. Super. 243, 245 (App. Div. 1998)). The court must focus on the cohabitant's economic relationship to discern "whether one . . . 'subsidizes the other.'" Id. at 571 (quoting Boardman v. Boardman, 314 N.J. Super. 340, 347 (App. Div. 1998)). Whether this economic benefit exists requires a fact-intensive inquiry by the trial judge. Id. at 576.

Our scope of review of the trial court's decision is limited. "Whether an alimony obligation should be modified based upon a claim of changed circumstances rests within a Family Part judge's sound discretion." Larbig v. Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006). Each individual motion for

modification is particularized to the facts of that case, and "the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters." Ibid. (quoting Martindell v. Martindell, 21 N.J. 341, 355 (1956)). We will not disturb the trial court's decision on alimony unless we:

> conclude that the trial court clearly abused its discretion, failed to consider all of the controlling legal principles, or must otherwise be well satisfied that the findings were mistaken or that the determination could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole.
>
> [Heinl v. Heinl, 287 N.J. Super. 337, 345 (App. Div. 1996).]

Prior to the Legislature's adoption of the 2014 amendments, the legal criteria for cohabitation were not specified by statute but instead embodied in case law. See, e.g., Konzelman, 158 N.J. at 195-203.

As the Supreme Court explained in Konzelman, cohabitation is typified by the existence of a marriage-like relationship "shown to have stability, permanency[,] and mutual interdependence." Id. at 202; see also Reese, 430 N.J. Super. at 570 (second alteration in original) (similarly noting that "[c]ohabitation involves an 'intimate[,]' 'close and enduring' relationship, requiring 'more than a common residence' or mere sexual liaison") (quoting

16

Konzelman, 158 N.J. at 202). Although "living together, intertwined finances such as joint bank accounts, shared living expenses and household chores, and recognition of the relationship in the couple's social and family circle" may support a finding of cohabitation, such illustrative examples must not be considered in a vacuum. Konzelman, 158 N.J. at 202. "A mere romantic, casual[,] or social relationship is not sufficient to justify the enforcement of a settlement agreement provision terminating alimony[,]" nor is simply sharing "a common residence, although that is an important factor." Ibid. "Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage." Ibid.

In 2014, the Legislature addressed cohabitation in subsection (n) of N.J.S.A. 2A:34-23. That provision sets forth the following considerations that bear upon cohabitation issues:

> n. Alimony may be suspended or terminated if the payee cohabits with another person. Cohabitation involves a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household.
>
> When assessing whether cohabitation is occurring, the court shall consider the following:

(1)  Intertwined finances such as joint bank accounts and other joint holdings or liabilities;

(2)  Sharing or joint responsibility for living expenses;

(3)  Recognition of the relationship in the couple's social and family circle;

(4)  Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;

(5)  Sharing household chores;

(6)  Whether the recipient of alimony has received an enforceable promise of support from another person within the meaning of subsection h. of [N.J.S.A.] 25:1-5; and

(7)  All other relevant evidence.

In evaluating whether cohabitation is occurring and whether alimony should be suspended or terminated, the court shall also consider the length of the relationship.  A court may not find an absence of cohabitation solely on grounds that the couple does not live together on a full-time basis.

After carefully reviewing the amendments, "we [saw] no indication the Legislature evinced any intention to alter the Lepis changed circumstances paradigm when it defined cohabitation and enumerated the factors a court is to consider in determining 'whether cohabitation is occurring' . . . ."  Landau, 461 N.J. Super. at 116 (quoting N.J.S.A. 2A:34-23(n)).  We determined the party

seeking modification still bears the burden of establishing "[a] prima facie showing of changed circumstances . . . before a court will order discovery of an ex-spouse's financial status." Id. at 118 (alteration in original) (quoting Lepis, 83 N.J. at 157).

Applying this standard, we are satisfied defendant made the requisite showing based on plaintiff's cohabitation with A.V. Accordingly, the judge properly terminated defendant's alimony and life insurance obligations as of January 1, 2017. In his cross-appeal, defendant contends his alimony and life insurance obligations should have been terminated in mid-2014 when plaintiff moved to Maine. We disagree and defer to the judge's determination on this issue.

As astutely pointed out by the judge, if the mid-2014 date was used, "it's problematic for everyone because they . . . defrauded the government" and it was unclear "how that's going to play out for both parties as well as their daughter." Moreover, January 1, 2017, was an appropriate alimony termination date "because that is when [plaintiff] filed her taxes in the tiny house." The judge's decision was based upon substantial, credible evidence in the record. Thus, we discern no abuse of discretion and deny defendant's cross-appeal on this issue.

19

We have no reason to disturb the finding that plaintiff is cohabitating with A.V. Thus, defendant's alimony and life insurance obligation were properly terminated.

## III.

Lastly, plaintiff contends that the counsel fee award of $20,000 to defendant's counsel was an abuse of discretion because the judge failed to consider all of the requisite factors set forth in <u>Rule</u> 5:3-5(c). Despite receiving an award of fees exceeding the amount sought in the certification of services, in his cross-appeal, defendant contends the judge failed to weigh the requisite factors and the award "contradicted" the judge's finding that plaintiff acted in bad faith.

In her decision, the judge found plaintiff was "less than honest about her cohabitation," that her testimony on the subject was "not reasonable," and she acted in "bad faith" by not settling the case. The judge declined to award all of the counsel fees defendant sought because she did not "have enough . . . financial information to do that." Instead, the judge awarded "$20,000 in attorney's fees on the . . . grounds of bad faith" without any articulating the basis for her decision.

N.J.S.A 2A:34-23 states, in relevant part:

Whenever any other application is made to a court which includes an application for pendent lite or final award of counsel fees, the court shall determine the appropriate award for counsel fees, if any, at the same time that a decision is rendered on the other issue then before the court and shall consider the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party.

Pursuant to Rule 4:42-9(b) and Rule 5:3-5(d), attorneys must submit an affidavit of services that addresses the factors listed in RPC 1.5(a), and itemize disbursements for which reimbursement is sought. Rule 5:3-5(c) lists the factors the judge must consider when deciding counsel fee applications:

(1)    the financial circumstances of the parties;

(2)    the ability of the parties to pay their own fees or to contribute to the fees of the other party;

(3)    the reasonableness and good faith of the positions advanced by the parties both during and prior to trial;

(4)    the extent of the fees incurred by both parties;

(5)    any fees previously awarded;

(6)    the amount of fees previously paid to counsel by each party;

(7)    the results obtained;

(8)    the degree to which fees were incurred to enforce existing orders or to compel discovery; and

21

(9)    any other factor bearing on the fairness of an award.

"The application of these factors and the ultimate decision to award counsel fees rests within the sound discretion of the trial judge." Loro v. Colliano, 354 N.J. Super. 212, 227 (App. Div. 2002); accord Slutsky v. Slutsky, 451 N.J. Super. 332, 365 (App. Div. 2017). "We will disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). Moreover, "[i]n considering an award of counsel fees, the judge must comply with [Rule] 1:7-4(a) and clearly set forth reasons for the exercise of discretion." Scullion v. State Farm Ins. Co., 345 N.J. Super. 431, 439 (App. Div. 2001).

Rule 1:7-4(a) requires that "[t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right . . . ." "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4." Curtis v. Finneran, 83 N.J. 563, 570 (1980). A trial court's failure to comply with Rule 1:7-4(a) "constitutes a disservice to litigants, the attorneys and the appellate court." Ibid.

(quoting Kenwood Assocs. v. Bd. of Adj. Englewood, 141 N.J. Super. 1, 4 (App. Div. 1976)). "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion." Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990). "A trial court decision will constitute an abuse of discretion where the decision [was] made without a rational explanation . . . ." Giarusso v. Giarusso, 455 N.J. Super. 42, 51 (App. Div. 2018) (quoting Saffos v. Avaya, Inc., 419 N.J. Super. 244, 271 (App. Div. 2011) (alternation in original)).

Here, the amount of counsel fees sought by defendant is unknown. Prior to the plenary hearing, defendant's counsel submitted a certification of services requesting a fee in the amount of $18,342.20. While the judge concluded that plaintiff acted in bad faith, it is unclear from the record why the judge awarded $20,000 as opposed to any other amount. Therefore, we vacate the $20,000 counsel fee award and remand the issue of counsel fees to the motion judge to make the required findings under Rule 1:7-4(a) and to perform the proper analysis under Rule 5:3-5(c) and N.J.S.A. 2A:34-23. The remand should be completed within thirty days and the motion judge shall give the parties the opportunity to file written submissions setting forth their positions on the issue of counsel fees.

We conclude the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24

A-3554-18T1