# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1074-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

A.H.,

      Defendant,

and

J.M.,

      Defendant-Appellant.

_____

IN THE MATTER OF C.M.
and L.M., minors.

_____

Submitted February 13, 2025 – Decided March 20, 2025

Before Judges Mawla and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FN-01-0202-21.

King Barnes, LLC, attorneys for appellant (Robert A. Loefflad, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Michelle McBrian, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor C.M. (Meredith Alexis Pollack, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor L.M. (Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant J.M. appeals from the April 3, 2023 Family Part order finding he had abused or neglected his minor daughter C.M. under N.J.S.A. 9:6-8.21(c)(3).[1] J.M. also appeals from the court's October 27, 2023 order terminating the litigation.

---

[1] We use initials to protect records relating to child victims of sexual abuse. R. 1:38-3(c)(9).

I.

The following facts are taken from the record of the fact-finding hearing. J.M. is the father of daughters C.M. and L.M., born in 2006 and 2008, respectively. A.H. is the biological mother of both children.[2] J.M. and A.H. were previously married but divorced in 2009. Pursuant to an agreement between the two parents, C.M. and L.M. lived with their father and paternal grandparents, while typically visiting their mother on weekends. This family has a history of involvement with the Division of Child Protection and Permanency (Division), dating back to 2007, when C.M. was seven weeks old. As of June 2021, the family had three prior Child Welfare Service (CWS) referrals and eight prior Child Protective Services (CPS) referrals.

The referral that led to this litigation occurred on June 4, 2021, when the police department received a call from the mother of a friend of C.M., who stated then-fourteen-year-old C.M. had disclosed sexual abuse by J.M. to her daughter the week prior. The referral was assigned to Division caseworker Shannon Chambers to investigate. The Division's investigative report states C.M. told her friend "for the last [six] months [J.M.] has been touching her breasts and

_____

[2] Although A.H. is named in the complaint, she was not a target of the abuse or neglect investigation. Additionally, the court made no findings of abuse or neglect with respect to L.M.

butt over [her] clothes." Further, C.M. stated J.M. had also been doing this to her younger sister, then-thirteen-year-old L.M.

The night of the referral, two workers from the Division's Special Response Unit (SPRU), went to A.H.'s house unannounced to see C.M. One of the workers spoke privately with C.M. while the other spoke with A.H. C.M. told the worker that she "was afraid of her dad and grandpop." When asked why, C.M. reported that "her dad used to hit her and he 'touches' her." The worker asked her why she was afraid of her grandfather and C.M. told the worker that "he creeps her out."

In addressing the reported sexual abuse, C.M. explained to the worker that when she has "long talks" with her father, "he will rub her thighs." C.M. reported for the past few months, "he has also tried to touch her boobs and butt" and "acts like its normal." She said that she "feels as though she has to wear baggy clothes at her dad's house."

C.M. also told the Division worker "she knows he has touched her sister as well. She said that she has witnessed it." The worker asked C.M. to describe what she had seen, C.M. told her "that they [would] play a game where they stand up and try to grab each other's butts." C.M. reported that since this "game" started, L.M. stopped visiting their mother. Her belief is that their father "bribes

[L.M.] with gymnastics on the weekend, so [L.M.] won't visit with her mom and tell [her] what's going on."

The Division's investigation led to a court order granting the Division care and supervision of C.M. and L.M. and suspending J.M.'s contact with them. Since February 2022, C.M. and L.M. have lived in North Carolina with A.H.

On June 22, 2021, C.M. was examined by Stephanie V. Lanese, M.D. via a telemedicine visit. Dr. Lanese asked C.M. what made her tell her friend about her father's behavior, C.M. replied, "[i]t really bothered me, and it was not normal." C.M. was relieved to report her father's abuse but also "scared" because she did not want J.M. to "take it out on" her. She did not blame herself for her father's behavior. C.M. described how J.M. had "long talks" with her while touching her upper thighs, touching her "up close, you know, like really up close there to the private area" and in the butt and hip area.

In her report, Dr. Lanese recounted one specific incident C.M. had described to her as follows:

> [C.M.]: [W]hen I'm on the couch, he looked at me, touched my boob and then made it look like it was an accident. But he was looking directly at me, so I don't know how it could have been an accident that he touched my boob. He just kind of reached out and did it.

A-1074-23

[Dr. Lanese]: Why do you think it was not an accident, though?

[C.M.]: It looked, you know, he looked me dead in my face, and he did that.

[Dr. Lanese]: What kind of touch was it?

[C.M.]: He kind of, like, grabbed. [C.M. made a squeezing motion with her fingers.]

[Dr. Lanese]: Was it under the clothes, over the clothes?

[C.M.]: Over the clothes.

Dr. Lanese concluded that J.M.'s touching of C.M. constituted sexual abuse, stating "while it was over clothes and not terribly invasive, it is still considered sexual abuse for someone to touch a teenager girl's breasts, and touching of her thighs close to her private area can make a teenager girl feel extremely uncomfortable." Further, Dr. Lanese stated, "[t]he most significant impact for the child is psychological and has the potential for long[]term negative consequences. It is important that she be referred to a clinical mental health provider for evidence-based mental health services to assess and make treatment recommendations regarding the above concerns for sexual abuse."

At the fact-finding hearing, which was held over five days commencing on October 21, 2022, the Division presented testimony from Dr. Lanese, C.M.,

A-1074-23

and Chambers. J.M. testified on his own behalf, and presented testimony from Division caseworker Brandie Slattery, and his parents. C.M.'s law guardian supported the Division's finding, and move for C.M. to testify in camera, over J.M.'s objection.

The court delayed C.M.'s testimony and permitted the attorneys time to brief the issue and obtain input from her therapist. C.M. remained inconsolable and "extremely fearful" of testifying in the same room as her father. C.M.'s therapist reported that she had post-traumatic stress disorder, severe anxiety, and nightmares about having to testify in J.M.'s presence. The court found that fact; together with the parties' briefs, the in camera interview of C.M., and its observations of C.M.'s visceral reaction to seeing J.M. at the first trial date, supported its finding that C.M. could testify in camera by clear and convincing evidence under N.J.S.A. 2A:84A-32.4. Referencing the therapist's report, the court reasoned to do otherwise "would be potential trauma" to C.M. Ultimately, the court ruled J.M. would observe the proceedings via Zoom from a separate courtroom while C.M. testified.

In her testimony, C.M. described J.M. as "toxic." She described the "long talks" that would occur where he would touch her upper thighs while saying "I love you" and "I don't want to see you go down the wrong path." C.M. also

described the incident when J.M. touched her breast and called it an accident, rhetorically asking how J.M. could reach for the remote and miss so completely as to grab her breast, especially given the fact that he had been looking right at her. C.M. testified she stayed in her locked bedroom as much as possible to protect herself when she was at J.M.'s house.

The court qualified Dr. Lanese as an expert in "general pediatrics with a specialty in child abuse pediatrics" based on her vast experience and dual board certifications in these fields. Dr. Lanese testified about her June 22, 2021 evaluation of C.M. and her testimony closely mirrored her written report.

According to the doctor, J.M.'s touching of C.M.'s breast constituted sexual abuse, as medically speaking, sexual abuse is defined as "the touching of private parts, which can include the breasts, front private, back private, and the touching can be with anything." The touching of C.M.'s thighs created a concern for the "process of victimization." Dr. Lanese explained abusers have a process of victimization where, after a child is chosen, the abuser engages in what can be viewed as innocent touching—tickles, massages, hugs—to accustom the child to physical contact before progressing to inappropriate touching of private areas, breasts and buttocks. And, when the abuser progresses to this phase, "that first

or second touching of the private areas tends to be very tentative, almost like it's accidental. It can be brushed off as though [']I didn't mean to do that.[']"

Then, the victimization progresses to the phase where the abuser cautions the victim that the conduct needs to be kept a secret to avoid the abuser getting into trouble. The abuser then cycles between these steps of innocent and inappropriate touching, progressively becoming more invasive as the child becomes desensitized to it. J.M.'s rubbing of C.M.'s thighs constituted victimization behavior and made C.M. feel uncomfortable.

J.M. testified he allowed C.M. "a lot of freedom" and "would never go upstairs [to her bedroom] because it's invading [her] privacy." However, he also described searching her bedroom; "constantly" going through her social media and phones; and tracking her. On cross-examination, J.M. acknowledged both C.M. and L.M. missed a significant number of days from school in the year leading up to their removal from his custody: C.M. missed forty-one days and L.M. missed sixty-one days and both girls "failed all classes."

J.M. testified he would touch C.M.'s thigh and knee when reprimanding her and admitted to having her massage his back. He denied knowing that his actions made her uncomfortable until she explicitly confronted him about it. J.M. could not recall ever grabbing C.M.'s breast. He claimed he had a brain

tumor and could not adequately remember, and testified "if it did happen . . . she knew in her heart that it was an accident." There was nothing in the record supporting J.M.'s claim he had a brain tumor.

The court found the Division had proven J.M. abused or neglected C.M. by sexually abusing her. It found C.M. and Dr. Lanese credible, and determined their testimony was consistent with their prior out-of-court statements. The court stated:

> [C.M.] was consistent across the board . . . in telling her friend's mother as to what occurred that she was touched; her [breast] was touched, her thigh leg area was touched in a circumstance where she was sat down by [J.M.] to deal with the circumstances that they were trying to address, in a way that it happened before where there have been incidents in which he took this approach in having discussions with her and sitting her down alone in her room touching her thigh, and on one occasion touching her [breast] and I found [her] testimony credible that this occurred, the touching of her [breast] occurred.

The court further found C.M.'s prior disclosures and testimony consistent, and J.M.'s own testimony corroborated elements of C.M.'s testimony that J.M. touched her thighs and had C.M. rub his back. It noted "[J.M.] testified about back rubs so I took that as corroboration of [the] incidents" of abuse. As the court concluded its decision, J.M.'s attorney asked the court "to clarify" its ruling and argued:

[U]nder the statute, the [c]ourt has to make a specific finding that the act of sexual abuse was done purposely for . . . sexual stimulation of either that person or the other person; in this case either he did it to sexually stimulate [C.M.] or he did it . . . for his own arousal purposes . . . . So I'm asking [y]our [h]onor on what basis you're making a finding that [J.M.] touched her breast specifically for the purpose [of] causing sexual stimulation of either [C.M.] or himself?

In response the court stated, "I'm making a finding based upon the testimony that he reached for whatever he reached for, I guess a T.V. remote. He touched her [breast], she looked up. He looked her in the eye, he didn't remove his [hand]. He didn't say I'm sorry." When J.M.'s attorney noted he had apologized the court responded as follows: "At this point, I'm finding that it was an act of sex abuse based upon the expert who testified in this matter that the touching of the [breast] was sex abuse. I'm making that finding based upon that." The court then clarified it was not making a specific finding of fact J.M. touched C.M.'s breast "for purposes of either his own sexual stimulation or the sexual stimulation of [C.M.]"

On November 17, 2022, the court entered an order terminating the litigation. This appeal followed.

II.

Appellate courts defer to the trial court's findings of fact "when supported by adequate, substantial, credible evidence."  Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)).  That review is altered slightly, however, in Family Part cases "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J at 413.  "Thus, 'findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence.'"  Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (quoting Cesare 154 N.J. at 413). "We invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012).  However, legal decisions of Family Part judges are reviewed under the same de novo standard applicable to legal decisions in other cases. Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013).

Deference is afforded to a trial court's credibility determination because the trial court had the ability to observe the demeanor, tone, and physical actions of all the witnesses and defendants during the hearing.  N.J. Div. of Youth &

Fam. Servs. v. M.M., 189 N.J. 261, 279, 293 (2007) (citing State v. Johnson, 42 N.J. 146, 161 (1964)). The judge sees witnesses firsthand and has a "feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

Under Title 9, an abused or neglected "child" means a child under eighteen years of age whose parent or guardian:

> creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(2).]

Title 9 provides prima facie evidence a child has been abused or neglected includes, "proof of injuries sustained by a child or of the condition of a child of

13

such nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." N.J.S.A. 9:6-8.46(a)(2). The proofs must be evaluated based on the totality of the circumstances "because the evidence can be synergistically related." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 39 (2011).

Ordinarily, a child's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Corroboration requires "direct or circumstantial evidence beyond the child's statement itself." N.J. Div. of Youth & Fam. Servs. v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2018)). Critically, however, "the corroboration requirement of the statute does not apply where the child victim testifies to the abuse at a fact-finding hearing." N.J. Div. of Child Prot. & Perm. v. Y.A., 437 N.J. Super. 541, 542 (App. Div. 2013).

On appeal, J.M. argues there was not sufficient evidence for the court to make a finding of sexual abuse because there was no direct or circumstantial evidence corroborating C.M.'s out-of-court statements, no eyewitness testimony, and no admission or confession by J.M. Accordingly, J.M. argues the court should have disregarded the testimony of Dr. Lanese and the Division caseworkers regarding C.M.'s out-of-court statements and relied exclusively on C.M.'s in-court, under oath, testimony.

We reject J.M.'s arguments because the court found C.M.'s testimony more credible and believable than his. C.M.'s testimony was corroborated by the Division's investigation report and Dr. Lanese's testimony, which explained J.M.'s conduct vis-a-vis the characteristics of sexual abuse and victimization. The court found "[C.M.] was consistent across the board in telling . . . her friend's mother as to what occurred." "[C.M.] respond[ed] to people asking her questions, look[ed] them in the eye, respond[ed] to those questions as best she could no matter how many different ways [J.M.'s] attorney tried to ask questions . . . ." The court further noted C.M.'s braveness in testifying:

> She responded to those questions not from shrinking from the opportunity to give that testimony, but

standing tall and moving forward with that testimony. This is someone [that] at the time of this event occurred was [fourteen], [fourteen] and a half years old[. S]o we're talking about someone that's [fifteen] or [sixteen] years old having the bravery to come in here and provide that testimony and respond to questions coming from the Division, from the law guardian, from [J.M.'s] attorney.

The court did not find J.M.'s arguments and explanations credible or believable. His own testimony "seemed to corroborate elements of [C.M.]'s story that it was [his] style and approach to deal with issues by sitting her down, talking to her, [and] putting [his] hand on her thigh."

Based on this record, the court did not err in relying on the testimony and evidence presented, including J.M.'s own statements, to support its finding there was abuse or neglect. The court based its decision on the credible testimony and evidence presented, and its observations of each witness's demeanor. We discern no basis to disturb the judge's decision.

B.

J.M. next argues the court's factual findings do not support its conclusion that he sexually abused either C.M. or L.M. within the meaning of N.J.S.A. 9:6-8.21. He asserts N.J.S.A. 9:6-8.84 defines sexual abuse as "contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or another person." Sexual contact under N.J.S.A. 2C:14-

16

1 is defined as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." J.M. argues the court did not make a finding whether he touched C.M. for purposes of sexual stimulation, and its determination that he sexually abused her must be reversed.

We recognize the court initially stated it would not make a specific finding of fact as to whether J.M. touched C.M.'s breast "for purposes of either his own sexual stimulation or the sexual stimulation of [C.M.]" However, appeals are taken from judgments rather than opinions. Bandler v. Melillo, 443 N.J. Super. 203, 210 (App. Div. 2015).

Even so, the record supports the court's finding J.M. abused or neglected C.M. by sexually abusing her. As we recounted, C.M. testified consistently with the abuse she reported to others, including a friend and then Dr. Lanese. Her precise description of the abuse, namely, where she and J.M. were when the abuse occurred, where J.M. touched her, and the duration of the abuse overall, including the duration of specific instances, more than met the Division's burden of proof to show J.M.'s conduct was intended for his own sexual stimulation. C.M.'s description of the abuse and her reaction to J.M.'s conduct certainly

demonstrated it was not for her stimulation. In other words, the substantial credible evidence in the record does not support the notion the touching was either accidental or intended for any purpose other than sexual stimulation.

These facts and conclusions were only made more obvious with Dr. Lanese's testimony detailing the process of victimization, and describing how an abuser will accustom a child to physical contact before progressing to inappropriate touching of private areas, breasts, and buttocks and "that first or second touching of the private areas tends to be very tentative, almost like it's accidental."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

18                                                                 A-1074-23